THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT MATHIS, Defendant-Appellant.

First District (5th Division)  No. 83—1836

Opinion filed May 24, 1985.

James J. Doherty, Public Defender, of Chicago (John M. Kalnins and Debra
A. Zisook, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat,
Karen C. Wirth, and Peter D. Zaper, Assistant State's Attorneys, of counsel), for
the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a bench trial, defendant, Robert Mathis, was found
guilty of contributing to the sexual delinquency of a child. (Ill. Rev.
Stat. 1981, ch. 38, par. 11—5(a)(1).) He was sentenced to one year's
probation, the first 30 days to be served in the Cook County House of
Corrections. Mathis contends for reversal before this court that the
evidence failed to prove his guilt beyond a reasonable doubt. We agree
and reverse.

The State contended and presented evidence at the trial of this case that 29-year-old Robert Mathis had sexual intercourse with L.C., his 12-year-old stepdaughter, with force and against her will. If the evidence had in fact established beyond a reasonable doubt that the defendant committed the acts attributed to him by the victim, then the defendant was proved guilty of a multiplicity of felony sex offenses, *i.e.*, rape, indecent liberties with a child, aggravated incest and sexual abuse of a child by a family member.

A male person of the age of 14 years and upwards who has sexual intercourse with a female, not his wife, by force and against her will commits rape, a Class X felony (Ill. Rev. Stat. 1981, ch. 38, par. 11—1(a)), the punishment for which is imprisonment in the penitentiary for a minimum mandatory period of not less than six years and not more than 30 years (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(3)). The extended-term provision of section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)(2)) is inapplicable to the facts of this case.

Any person of the age of 17 years and upwards commits indecent liberties with a child when he performs with a child under the age of 16 any act of sexual intercourse or any lewd fondling or touching of the child with the intent to arouse or satisfy the sexual desires of either the child or the person or both. Indecent liberties with a child is a Class 1 felony. (Ill. Rev. Stat. 1981, ch. 38, pars. 11—4(a)(1), 11—4(a)(3).) The punishment therefor is imprisonment for not less than four years and not more than 15 years. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(4).

When a male person has sexual intercourse with a person he knows to be his stepdaughter, he commits aggravated incest, a Class 2 felony. (Ill. Rev. Stat. 1981, ch. 38, par. 11—10(a)(1).) The punishment for a Class 2 felony is imprisonment for not less than three years and not more than seven years. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(5).

Any male person who performs (1) any lewd fondling or touching of, or (2) any act of penetration of any object into the sex organs of his stepdaughter, under 18 years of age, with the intent to arouse his sexual desires, commits the offense of sexual abuse of a child by a family member, a Class 3 felony. (Ill. Rev. Stat. 1981, ch. 38, pars. 11—11.1(a)(1), 11—11.1(a)(2).) The punishment for a Class 3 felony is imprisonment for not less than two years and not more than five years. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(6).

In the case before us, however, the defendant was not charged with rape, indecent liberties with a child, aggravated incest or sexual

abuse of a child by a family member. Instead, the defendant was charged with a Class A misdemeanor offense of *contributing to the sexual delinquency of a child*. This offense provides that any person of the age of 14 years and upwards who performs any act of sexual intercourse or any lewd fondling or touching of a child under the age of 18 years with intent to arouse or satisfy either person's sexual desire contributes to the sexual delinquency of a child. (Ill. Rev. Stat. 1981, ch. 38, pars. 11—5(a)(1), 11—5(a)(3).) The penalty for the offense of contributing to the sexual delinquency of a child is imprisonment for any term less than one year. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—3(a)(1).

The complaint in the case at bar alleged that on January 18, 1983, the defendant "committed the offense of contributing to the sexual delinquency of a child in that he, a person of the age of 14 years and upwards, performed an act of sexual intercourse with [L.C.], a person under the age of 18 years." The trial judge found the defendant guilty. The trial judge rejected the assistant State's Attorney's lenient recommendation of six months' imprisonment. Instead, the trial judge imposed the meager and more permissive punishment of probation for one year, the first 30 days thereof to be served in the custody of the Cook County Department of Corrections.

If the evidence was sufficient to establish beyond a reasonable doubt that this 29-year-old stepfather committed the act of sexual intercourse with his 12-year-old stepdaughter, by force and against her will, the defendant should have been prosecuted under the appropriate felony offenses and if found guilty, he should have been properly punished. If, on the other hand, the evidence failed to establish beyond a reasonable doubt that the defendant had sexual intercourse with his 12-year-old stepdaughter, by force and against her will, the defendant should have been found not guilty and discharged.

Before this court, the defendant unyieldingly argues that the evidence miserably failed to establish beyond a reasonable doubt his guilt of the commission of the offense of contributing to the sexual delinquency of a child. The evidence follows.

### THE STATE'S EVIDENCE

L.C.'S TESTIMONY
DIRECT-EXAMINATION

On January 18, 1983, L.C. was 12 years old and lived with her mother, two brothers, ages three and seven, and Robert Mathis, her stepfather. On that date, at about 9 p.m., L.C. was home with her

mother, brothers and Mathis. She was alone in her room preparing for bed. As she was taking her pajamas out of the drawer, Mathis entered her room and told her not to go to bed. L.C. asked why, and Mathis responded, "Just don't go to bed."

L.C. then went into the bathroom, put on her pajamas and returned to her room to go to bed. Mathis entered her room with a long, brown, doubled extension cord. (L.C. indicated the length of the cord to the trial judge, who estimated the length to be "about two or three feet.") Mathis told L.C. to get out of bed and she asked, "Why get out the bed?" When Mathis threatened to hit her with the extension cord, she got out of the bed. Mathis ordered her to "Get in the front." L.C. went and sat down in the living room in the front of the apartment, where Mathis had turned up the volume of the radio and television. L.C. watched the television. Mathis went into the room L.C. described as "her mother's room," with drinks and reefers. L.C. then called her grandmother, Mary Covington.

Mathis returned to the living room and L.C. asked him, "Could I go to the bathroom?" She went to the bathroom and returned to the living room because Mathis was right behind her. Mathis said, "I don't want you to be like your aunties June and Evonia—with babies." Mathis returned to the bedroom.

Mathis came back to the living room and closed the door to L.C.'s mother's room. Mathis began feeling on L.C.'s breasts, buttocks and in her vagina and told her to take off her clothes. L.C. said, "I don't want to take off my clothes." Mathis repeated, "Take off your clothes," and L.C. repeated that she did not want to take her clothes off. Mathis hit her on her breast with the extension cord. L.C. then "had to take off" her clothes, and Mathis again began feeling on her breasts, buttocks and vagina. Mathis told L.C. to go to the kitchen, and she asked why. Mathis told her, "Just go in the kitchen." She did not go, and Mathis hit her on her legs.

L.C. went into the kitchen and Mathis told her to lie down. L.C. testified that she did not want to lie down, but when Mathis hit her again, she did so. Mathis then told her to open her legs. L.C. refused until Mathis hit her again. Mathis took his pants off, lay on L.C. and inserted his penis into her vagina. It was painful, and she was moving around. Mathis told her to get up because "it was hurting." Mathis told her to go to her room, which she did not want to do, but Mathis hit her again and she did, in her pajamas.

CROSS-EXAMINATION

Mathis had been married to L.C.'s mother for eight years, during

which time he lived with them. L.C.'s mother and brothers were in the apartment when the incidents she described occurred. L.C. watched television in the living room when Mathis went into her mother's room, which is next to L.C.'s room.

L.C.'s grandmother and two aunts arrived while the incident was taking place. When Mathis went to answer the door, he told L.C. to put on her pajamas. Mathis opened the door and L.C.'s aunt Evonia and grandmother came to L.C.'s room. When the police arrived they took L.C. to Provident Hospital. While en route, L.C. and her grandmother talked to the police officers. L.C. was examined by a doctor at the hospital.

L.C.'s mother was in her bedroom during the entire incident with Mathis. L.C. did not talk to her mother at all that night. After the alleged act of intercourse, L.C. did not go and talk to her mother because, according to L.C., she was asleep, drunk and "high" and if L.C. said anything, "it would go in one ear and go out the other."

L.C. has not lived with her mother since this incident occurred. She has lived with her grandmother. L.C. did not have a good relationship with her mother. She testified that she would like to continue living with her grandmother. L.C. has wanted to live with her grandmother for a long time and her grandmother has also wanted L.C. to live with her. L.C.'s grandmother had even asked L.C.'s mother if L.C. could live with her instead of her mother.

REDIRECT EXAMINATION

"Q. You were going back to live with your mother on your birthday weren't you?

A. No.

Q. When you went over to the house to see her?

A. She asked me and I told her if she moved out of the projects.

Q. Did you tell her that she had to do anything else?

A. I told her that I didn't want Robert Mathis to stay there.

Q. And then you would go back to live with her, right?

A. Yes.

Q. If she moved out of the projects and stopped living with Robert Mathis?

A. Yes.

Q. You told her that on your birthday, right?

A. Yes."

RE-CROSS-EXAMINATION

L.C. had previously complained to her mother about Mathis. She had told her mother that she did not want to live with Mathis, but she did not know how many times she had told that to her mother.

L.C. had previously told lies. She knew that telling a lie sometimes helped her to get what she wanted. She had previously lied when she knew she should have told the truth, as she said that she was always supposed to do.

FURTHER REDIRECT EXAMINATION

"Q. What else did you tell your mother besides you didn't want to live with Robert? Did you tell her anything else that Robert had done to you in the past?

A. Yes.

* * *

Q. How many times have you complained about Robert to your mother before?

A. At the time when he was raping me, three times, but I complained to her a lot.

* * *

Q. What was he doing to you before that?

A. He was doing the same thing he was doing on January 18th, he was feeling me.

Q. How many times was he feeling on you before January 18th, if you remember.

A. I don't know because he has raped me more than once.

* * *

Q. How many times before January 18th did you tell your mother that Robert had touched your body?

A. Three times.

Q. And what did your Mom do about that?

A. She didn't do nothing.

Q. She didn't do anything?

A. No. And I told the priest about it.

Q. What priest?

A. A Catholic priest at St. Elizabeth.

Q. Did you tell your Mom you told the priest?

A. No.

Q. But you told your Mom three times before January 18th, the night we are talking about now that Robert touched your body?

A. Yes.

Q. Your Mom did nothing.
A. Right."

FURTHER RE-CROSS-EXAMINATION
"Q. [L.C.] have you ever lied to your mother before?
A. Yes."

EVONIA COVINGTON'S TESTIMONY
DIRECT EXAMINATION

Evonia Covington was L.C.'s aunt. On January 18, 1983, Evonia, her sister June and her mother, L.C.'s grandmother (Mrs. Covington), went to L.C.'s home in response to L.C.'s 9 o'clock telephone call to her grandmother. When they arrived, the T.V. and radio were playing loudly. Evonia and June banged on the door for at least two minutes. Mathis came to the door and let them in. Mrs. Covington went to the bathroom while Evonia and June stood with their coats on. Mathis said, "What the f--- you all standing up for, take off your m----- f------ coats and sit down." Evonia said, "I don't have to take nothing off, this isn't your house, this is my sister's house." Mrs. Covington returned from the bathroom and said, "What's going on?" Evonia went to the back and found L.C. lying on the bed. L.C. had on an open dress with no underclothes. Evonia told L.C., "Get up, we're going." L.C. got up and put on her clothes.

CROSS-EXAMINATION

L.C. called at about 9 o'clock. It took about an hour to get from Evonia's home to the projects where L.C. lived. They came because L.C. called. Mrs. Covington came to get her. Mrs. Covington told Evonia that she wanted to have L.C. at home with her. Evonia did not have any idea why she was going to L.C.'s home.

THE DEFENSE EVIDENCE

MARY COVINGTON
DIRECT EXAMINATION

On October 7, 1974, Mary Covington married Robert Mathis and they lived together with her three children. On January 18, 1983, at about 9 p.m., Mary was home in her bedroom talking to her three children and husband. Later, she lay down and watched T.V. The boys went to their room and L.C. went to the washroom to wash her blouse. L.C. did not talk to her after she had lain down. Mathis went to the kitchen in the front. At about 11 p.m., Mary's mother, Mrs.

Covington, and her two sisters came to her apartment. Mary testified that L.C. never complained to her about Mathis bothering her and she did not hear anything unusual in the apartment. Mathis did not come into her room after she had lain down. Mary also said that L.C. never told her that she did not want to live with Mathis. Following this incident, L.C. lived with her grandmother and had a birthday.

CROSS-EXAMINATION

"Q. Did you see your daughter [L.C.] on her birthday? Did she come over to your house?

A. No.

Q. You didn't see your daughter on her birthday?

A. No.

Q. Did you see her around her birthday? Did you talk to her around her birthday?

A. Yes.

Q. Did you tell her you wanted her to live with you at that time? You wanted her to come back?

A. I asked her did she want to come back?

Q. Didn't she tell you she would come back if you moved out of the projects and left Robert?

A. No. She said she would come back with me if I moved out of the projects."

Testifying further, Mary Covington said that on the day of the incident, she was not in her room drinking or smoking a reefer. She stated that she was alone, lying down in her bedroom, watching T.V.

ROBERT MATHIS
DIRECT-EXAMINATION

On January 18, 1983, Mathis was living with Mary Covington, to whom he was legally married and of which marriage two children were born. Mathis also provided for L.C. At about 9 o'clock, Mathis was home watching T.V. with his wife and the children in his wife's bedroom. Mary Covington told L.C. to wash her blouse for school. Mathis left Mary's bedroom and went to the front. L.C. never came into the front that evening.

Mathis' mother-in-law and sisters-in-law came over that night at about 10 p.m. and he admitted them into the apartment. They never liked him. They did not visit Mary, especially at that time of night, so Mathis asked them was was wrong. They did not reply, so Mathis told them, "Rest your coats and have a seat." They remained standing. Evonia went into L.C.'s room. Mathis again asked what was wrong.

June, his other sister-in-law, called the police.

Mathis went to the back, opened the door and asked for the third time, "What is wrong?" Evonia was pulling L.C.'s clothes off and told Mathis to get out of the room. His wife, Mary, and her mother, Mrs. Covington, came back. Evonia pulled out a knife and waved it at Mathis. Mary's mother stepped in front of Evonia. Mathis did not know what was wrong with Evonia, so he picked up a stick off the shelf and told Evonia what he might do if she did not put the knife down. Mrs. Covington said, "No Robert. Go ahead on." Mathis' wife, Mary, pushed Mathis out of the room and Mathis went back to the front.

After L.C. was dressed and the three ladies started out the door with her, Mary said, "Wait. Where are you going?" Mrs. Covington said, "I told her to let me have L.C."

Mathis testified that his relationship with his wife's sisters had been "hell" for nine years. He had three verbal and physical fights with his wife's sisters in the past. He stated that on the day of the incident he did not strike L.C., nor did he hit her with an extension cord. He has disciplined L.C. in the past. He did not have sexual contact or sexual intercourse with L.C., nor did he touch any part of her body, or fondle her in any way, or make any lewd gestures toward her. He did not tell L.C. not to go to bed on that date.

CROSS-EXAMINATION

Mathis testified that L.C.'s aunts and grandmother did not call the police immediately after they talked to L.C. When Mathis answered the door, the radio was on, but the T.V. was not on. The radio was loud enough for him to hear. He was alone in the living room sitting on the chair only a few feet from the door when they knocked. Mary was in her room, but he did not know whether her door was shut.

An appropriate point at which to begin an analysis of the evidence in this case is to scrutinize the credibility of the alleged victim, L.C. In response to questions put to her "to establish her competency," L.C. testified that she knew "what it is to tell a lie." She said, "[That] is when you're not telling the truth." She further testified that she knew "what it is to tell the truth." She said, "[That] is when you're telling the truth." She initially answered "No" when asked if she knew what it meant to be "under oath" and "when the bailiff swore you in before." When told, "[T]hat means you must tell the truth. Do you understand that?" She responded, "Yes." She was asked if she understood that she "could go to jail if you don't tell the

truth." She replied, "Yes." The trial judge found, "She answered the question '[D]o you understand that you could go to jail if you don't tell the truth?' without hesitation. I find her quite competent. She seems to be all right to me. Let's go." L.C. was then called as a State's witness and testified:

"Q. You've told lies before, haven't you?

\* \* \*

A. Yes.

Q. And you know that by telling a lie sometimes that helps you get what you want?

A. Yes.

Q. And you probably told a lie before when you know you should have told the truth?

A. Yes.

Q. You know you're always supposed to tell the truth, right?

A. Yes.

\* \* \*

Q. Have you ever lied to your mother before?

A. Yes."

Not only did this evidence establish that L.C. knew that telling a lie would help her get what she wanted, the evidence also established *what* she wanted, and that was a motive for her fabrication. She wanted to move out of the Chicago Housing Authority public housing projects. When asked by the assistant State's Attorney, "Would you make up a story so you could stay with your grandmother? Would you tell a lie so you could stay with your grandmother?" L.C. responded, "No." Had she responded in the affirmative, it is unlikely that the case would be before this court. Her responses on this subject are quite revealing.

L.C. testified that she would like to stay with her grandmother and that she had wanted to stay with her for a long time. She related further that her grandmother had wanted her to stay with her and that her grandmother had even asked L.C.'s mother if L.C. could stay with her. L.C. also stated that she saw her mother on her (L.C.'s) birthday, which was a few weeks before her court appearance. L.C.'s answers to the nonsuggestive and nonleading questions on direct examination disclosed her true feelings. L.C. testified.

"Q. You were going to go back to live with your mother on your birthday, weren't you?

A. No.

Q. When you went over to the house to see her.

A. *She asked me, and I told her if she moved out of the pro-*

*jects."* (Emphasis added.)

The assistant State's Attorney correctly recognized that this unexpected revelation of L.C.'s concerns and desires was extremely probative of her motive to lie. In an effort to rectify it, he queried:

"Q. Did you tell her she had to do anything else?

A. *I told her that I didn't want Robert Mathis to stay there.*

Q. And then you would go back to live with her right?

A. Yes.

Q. *If she moved out of the projects and stopped living with Robert Mathis.*

A. Yes." (Emphasis added.)

If Mathis had done the horrible things to L.C. that she alleged he did, her primary concern, it would seem, would have been not to live with him. It would also seem that such a concern would not need to have been provoked by a suggestive question. Rather, it would have been a far more spontaneous response. Her reluctance to live with Mathis appears to have been an idea that was instilled by the State as a fanciful afterthought.

A defense witness, L.C.'s mother, testified under cross-examination that she talked to L.C. on or about the day of L.C.'s birthday. She stated:

"Q. Did you tell her you wanted her to live with you at that time? You wanted her to come back?

A. I asked her did she want to come back.

Q. Didn't she tell you she would come back if you moved out of the projects and left Robert?

A. No. She said she'd come back with me if I moved out of the projects.

Q. She didn't say—

A. She didn't mention his name. She just asked me."

Thus, the mother of this alleged rape-incest victim, a witness on behalf of the defendant, unequivocally corroborated the victim's motive to fabricate. Her daughter wanted to move out of the projects—at any cost!

The evidence further established that the atmosphere between the defendant and his in-laws, the victim's maternal grandmother and aunts, was fertile for their acceptance of the victim's accusations against the defendant. The defendant described his relationship with his wife's sisters as being "hell for nine years." He stated further that he had physical and verbal fights in the past with them.

The defendant denied that he was profane when he admitted his mother-in-law and his two sisters-in-law, Evonia and June Covington,

into the apartment. Neither the grandmother nor June Covington testified at the trial. Evonia testified, however, that when they entered the apartment, her mother immediately went to the bathroom. The defendant then allegedly greeted her and June with, "What the f---you all standing up for? Take off your m----- f------ coats and sit down." Evonia Covington testified that she responded, "I don't have to take nothing off. This isn't your house this is my sister's house." If this exchange occurred, it certainly demonstrates a hostility between them. If the exchange did not occur and it was fabricated by Evonia Covington, it suggests an even deeper hostility by her against the defendant.

With these preliminary factors before us, the ultimate question presented is whether the evidence established beyond a reasonable doubt that the defendant had sexual intercourse with the victim.

■ Where the act which constitutes the offense of contributing to the sexual delinquency of a child is an act of forcible sexual intercourse, as was alleged in the case at bar, the burden of proving that act beyond a reasonable doubt is the same burden as when the defendant is charged and on trial for the offense of rape. That burden of proof beyond a reasonable doubt is not eviscerated by reducing the charge from rape to the charge of contributing to the sexual delinquency of a child.

In *People v. Bryant* (1970), 123 Ill. App. 2d 35, 259 N.E.2d 638, the defendant was charged with contributing to the sexual delinquency of a child. The victim testified that the defendant "stuck hisself in her," after dragging her into a basement and after she had told him no when he asked her if she would "give him some." The defendant denied the acts attributed to him by the victim. In reversing the conviction, the court stated:

> "We are cognizant of the problems that exist in the proof of sex crimes. *We consider the offense of contributing to the sexual delinquency of a child to be of the same genre and subject to the same evidentiary standards as those which are applied in rape cases.* Just as 'an indecent liberties case is similar in character to that of rape' (*People v. Watkins*, 405 Ill. 454, 457, 91 N.E.2d 406), so is the instant offense. As the court stated in *Watkins*:
>
>> [I]t is an accusation easily made, hard to be proved, and harder to be defended by the party accused, though ever so innocent. (People v. Phipps, 338 Ill. 373.) We have always safeguarded the interests of an accused where the testimony is uncorroborated, by requiring that it should be clear and convincing.

Upon a thorough review of the record, we find that the testimony of the twelve-year-old complaining witness is not very satisfactory. We agree with defendant that, *because her testimony is uncorroborated and is not of the clear and convincing quality necessary for conviction, it leaves a reasonable doubt as to his guilt.*" (Emphasis added.) 123 Ill. App. 2d 35, 39.

The facts of *People v. Henderson* (1968), 102 Ill. App. 2d 152, 243 N.E.2d 605, are strikingly similar to the facts of the instant case. In *Henderson*, the victim was 14 years old and the defendant's natural daughter. The victim was preparing for bed at about 10 p.m. when the defendant called her into his bedroom and, according to the victim, had sexual intercourse with her, while four other household members were in the apartment. In *Henderson*, as in the instant case, the victim testified to previous acts of intercourse with the defendant. Henderson denied the acts of sexual intercourse. In reversing his conviction, the court held:

"Where a conviction is based solely on the testimony of the complaining witness, who is a child, and the defendant denies the charge, the testimony of that witness must be clear and convincing or must be corroborated by other substantial evidence. [Citations.] And to sustain a conviction on the uncorroborated testimony of the prosecutrix, her testimony must be clear and convincing. [Citation.]

In the instant case, we are not satisfied that the daughter's testimony was of such a clear and convincing nature." 102 Ill. App. 2d 152, 157.

The defendant was found guilty by the trial court of taking indecent liberties with a nine-year-old child in *People v. Morgan* (1977), 69 Ill. 2d 200, 370 N.E.2d 1063. The victim testified that while her parents were asleep, the defendant entered her bedroom, awakened her, took her into the living room and kissed her on her "crotch." The trial judge relied on the testimony of the victim's grandmother that that area of the victim was red and irritated as corroboration. The defendant denied the acts. The supreme court stated in reversing:

"Contrary to the State's contention, the complainant's testimony was neither clear and convincing nor substantially corroborated as required in cases of this nature. [Citation.]

*** While due weight must be given to the trier of fact as to the credibility of the witnesses, 'it is our duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged.' " 69 Ill. 2d 200,

206-07.

*People v. Kolden* (1962), 25 Ill. 2d 327, 185 N.E.2d 170, involved an alleged sex offense against a minor. The conviction was reversed in the following language of the supreme court:

> "It is well settled in Illinois that where a conviction for taking indecent liberties with a child depends on the testimony of the prosecuting witness, and the defendant denies the charge, there must be substantial corroboration of her testimony, or the testimony must be otherwise clear and convincing. [Citations.]
>
> * * *
>
> While we are cognizant of the difficulties in adducing proof in cases of this type, *** the very odium and prejudice arising from such a charge requires that the courts do not vitiate the traditional requirement of proof beyond a reasonable doubt. From the record before us we are convinced that the State has failed to sustain this burden." 25 Ill. 2d 327, 329-30.

In *People v. Nunes* (1964), 30 Ill. 2d 143, 146, 195 N.E.2d 706, the victim, who was 12 years old, testified that the defendant kissed and fondled her, put his arms around her and had her touch his private parts. The victim's 12-year-old friend endeavored to corroborate her. The jury found the defendant guilty. The supreme court reversed, stating:

> "It is axiomatic that a charge of indecent liberties is an accusation easily made, hard to be proved, and harder to be defended by the party accused. [Citation.] *In such cases reviewing courts are especially charged with the duty of carefully examining the evidence,* and while due weight must be given to the judgment of the jury as to the credibility of the witnesses, *it is our duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged."* (Emphasis added.)

■ It appears in the instant case that the victim initially attempted to create the impression that it was because her mother had imbibed in "drinks and reefers" that she did not make an outcry to her. This impression was to have been derived from the victim's testimony that the defendant entered her mother's bedroom with "drinks and reefers." The assistant State's Attorney adroitly avoided eliciting from her on direct examination why she did not make an outcry or complain to her mother, and he adamantly objected when the defense attorney endeavored to obtain this information on cross-examination. The victim first offered that her mother was asleep as the reason for

her not making a complaint to her. She expanded that reason in the following way:

> "Q. You told the judge that your mother was in her room the whole time this happened?
>
> A. Yes.
>
> Q. Had you talked to your mother all that night?
>
> A. No.
>
> Q. Now, when Robert got up and left you, you didn't go and talk to your mother, did you?
>
> A. *No, because she was asleep.*
>
>         \* \* \*
>
> Q. Did you try to talk to your mother at all that night?
>
> MR. GORDON [assistant State's Attorney]: Your honor, I would object.
>
> THE COURT: Overruled. Did you?
>
> A. No, because she was drunk and high anyway. So if I talked to her—
>
> MR. LIEBERMAN [defense counsel]: Objection, Your honor, ask her just to answer the question.
>
> THE COURT: No, you opened it up. \*\*\*
>
> THE WITNESS: She was drunk and high. If I did say something, it would go in one ear and go out the other." (Emphasis added.)

The victim must have known that her maternal grandmother and aunts would contradict her testimony that her mother was drunk and the assistant State's Attorney's awareness of this precluded him from inquiring in this area. Neither the victim's grandmother nor her aunts corroborated the victim's testimony that her mother was intoxicated or under the influence of drugs when they arrived at the apartment, and both the defendant and the victim's mother denied that they had imbibed in drugs or intoxicating beverages.

The victim apparently endeavored to additionally justify her failure to make an outcry to her mother by her testimony that the defendant turned up the radio and T.V. But raising the radio and T.V. volume to drown out an outcry would appear to be incompatible with the slumber of the victim's seven- and three-year-old brothers and her mother who was supposedly asleep and intoxicated.

The victim testified that the defendant repeatedly beat her on her breast and legs with a doubled extension cord. The extension cord was not produced in court. Moreover, neither the victim's grandmother nor her aunts testified to a single abrasion, laceration, welt or other evidence of a beating or striking on the victim. Evonia Covin-

gton, the victim's aunt, was not asked and did not describe the victim's appearance upon her arrival, except to say that the victim had a "dress on, open with no underclothes on."

The victim testified that pursuant to the defendant's direction, she went from her bedroom to the living room and sat down and that the defendant increased the radio and T.V. volume and then went into her mother's room. The victim testified that it was at this point she called her grandmother. Evonia Covington testified that she and her mother, the victim's grandmother, and her sister, June, left their home and rode the bus to the victim's home, but that she had no idea why she was going to the victim's home. The victim testified that after she called her grandmother, the defendant returned to the living room, struck her with the extension cord and forced her to go into the kitchen, where he told her to lie down. She refused and the defendant struck her again. She lay down and when the defendant told her to open her legs and she refused, the defendant hit her again. When she opened her legs, the defendant took his pants off and lay on her and "stuck his penis in my vagina and it hurt." The defendant told her to get up, because "it was hurting," and to go to her room. She did not want to go to her room and the defendant hit her again. The victim testified that she went in her room in her pajamas. Evonia testified, however, that when she arrived, the victim had on a dress.

Mary Covington, the victim's mother, testified that the victim never made any outcry or complaint to her about the defendant and that nothing unusual occurred in her home on the night in question until her mother and two sisters arrived. The defendant denied that he struck the victim or had sexual intercourse with her.

The victim and Evonia Covington testified that the victim was taken to a hospital where she was examined by a doctor. Yet, no hospital records were offered or admitted into evidence to corroborate that she had been examined, or to corroborate her physical condition of her alleged beating and rape. Thus, the victim's version was "without any corroboration from its most logical source." *People v. Bryant* (1970), 123 Ill. App. 2d 35, 40, 259 N.E.2d 638.

The victim's testimony was uncorroborated. It was not clear and convincing and the evidence failed to prove the defendant guilty of contributing to the sexual delinquency of a child. For the foregoing reasons, the judgment of conviction is reversed.

Reversed.

MEJDA, P.J., and SULLIVAN, J., concur.