THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EZELL FAIN *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 61866

Opinion filed August 24, 1976.

James R. Streicker and Allen L. Wiederer, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Eugene J. Rudnik, Jr., and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Ezell Fain and Edward Brown (defendants) were found guilty by a jury of attempt murder, two counts of aggravated battery, and armed robbery. Fain was sentenced for concurrent terms of 15-75 years for attempt murder and armed robbery, and 3-10 years for aggravated battery; Brown was sentenced for concurrent terms of 10-50 years for attempt murder and armed robbery, and 3-10 years for aggravated battery.

While defendants were represented by separate counsel at trial, they are represented by the same counsel on appeal and raise the following issues for review:

(1) did the trial court err in allowing the State to introduce testimony

and argument from which the jury might infer certain persons who did not testify had seen Brown commit the charged offenses;

(2) did the trial court err in sustaining general objections without explaining the grounds for its rulings;

(3) did the trial court err in allowing the State to introduce a rebuttal witness who had not been disclosed;

(4) were defendants proved guilty beyond a reasonable doubt; and

(5) was it error to convict defendants of more than one offense arising out of a single act.

On the evening of February 5, 1973, Gillie and Fannie Horton, while leaving Englewood Hospital (60th & Green, Chicago, Illinois), were approached by three black youths. Fannie's pocketbook was taken; Gillie was held at gunpoint and searched, and then shot. Defendants were charged with being two of the persons who committed these crimes.

At trial, John McLeod, a Chicago police officer, testified that in response to an assignment about 9:45 p.m. on February 5, 1973, he went to Englewood Hospital where he met Fannie Horton outside the emergency room. He testified that she was in an upset condition; and that her husband, Gillie Horton, was in the emergency room unable to converse at that time. After talking with Fannie, McLeod accompanied her to the scene of the incident. Fannie then returned to the hospital. McLeod went to visit some of the homes in the area. McLeod then returned to the police station where he obtained six or seven photographs which he brought back to the hospital to show Fannie, who viewed the photographs and from them she identified Brown as one of the offenders. McLeod also testified that at a lineup the following day, February 6, 1973, Fannie identified defendants Brown and Fain as two of the persons who had attacked her and her husband the prior evening. Defendant Fain wore a white coat with four brown stains at the time of the lineup. McLeod took this coat from Fain and had tests conducted on the stains. The coat was admitted into evidence.

Gillie Horton testified he went to Englewood Hospital about 6:55 p.m. on February 5, 1973, to visit his brother where he met his wife, Fannie, and his sister-in-law, Lola Horton. Leaving together at about 8:05 p.m., Gillie and Fannie walked down the east side of Green toward 60th where their car was parked, while Lola went the other way to obtain her car. As Gillie and Fannie walked to their car, they noticed three boys standing on the east side of Green Street. The Hortons crossed the street to their car, and as Gillie was attempting to open the car door, Gillie heard Fannie say her pocketbook was gone, and then heard one of the boys announce, "This is a stick-up." Gillie did not notice which boy said this, but he did notice the boy to the left of him was holding a gun at his head. Gillie made an in-court identification of Brown as the person holding the gun. Gillie

also identified Fain in court as the person who searched him while Brown held the gun. Gillie testified that the lighting in the area was good; and that he had an opportunity to view the faces of his assailants for about five minutes. Gillie had been wearing two pair of pants at the time of the incident, and the persons searching him could not get to his wallet. Gillie kept moving around, and the robber told him that if he did not stand still he would be shot. The boy with the gun fired a shot hitting Gillie's left side, then said, "Let's get out of here," and the boys then ran toward Halsted Street. In Gillie's opinion the whole incident took about 12 minutes. Gillie was taken to the emergency room of Englewood Hospital and did not recall talking to any police officers until about four weeks after the incident when he was shown some pictures from which he identified the defendants as his assailants. He claimed he never saw either of the defendants before, but then admitted previously seeing defendant Brown in the neighborhood, although he did not know his name. He identified the white coat as similar to one worn by the person who searched him for a wallet.

Fannie Horton testified to the same series of events. She also made in-court identifications of Brown as the boy holding the gun and Fain as the one who searched Gillie. She also testified the lighting in the area was good and that she had a good opportunity to view the assailants. After Gillie was shot, Fannie saw Lola's car coming down the street. She flagged Lola down and they took Gillie to the emergency room. Gillie was hospitalized for 12 days and remained at home for five weeks as a result of the wound inflicted by the bullet. Fannie recalled seeing Officer McLeod the same night that the incident took place and recounted giving the officer the following description of the offenders:

"The one had the gun, he was wearing dark clothes and had bushy hair. And had a large nose and big lips. The tall one had on a light, long coat, and he was wearing a black cap and he was tall and skinny."

She further testified she identified Brown in a photograph which was shown to her later that evening at the hospital. She noted Fain's picture was not among those shown to her. She viewed a lineup the following day, February 6, 1973, and identified both defendants as the offenders. Her testimony indicated the incident took place about 8:15 p.m. and continued until 8:20 or 8:25. Fannie also admitted to having seen Brown in the neighborhood prior to the offense, and that she had not mentioned this fact to any of the investigating officers.

Officer James Moylan testified regarding the events which took place on February 6, 1973, a day after the occurrence, surrounding defendants' arrests. Moylan, a Chicago police officer, was called to investigate an automobile at 60th and Wallace. When he and his partner arrived at this

location, they saw a blue Pontiac with no license plates and open doors. The officers noticed six male Negroes across the street. One was tall and slender wearing a white coat and black hat. During the investigation of the auto, the officers received a call on their radio to go to the scene of a family disturbance. They left the Pontiac and went to the family disturbance. When they returned to the location of the Pontiac, it was gone. Moylan radioed communications to see if the car had been towed, but it had not. While cruising the area, Moylan spotted the Pontiac in an alley near 5938 S. Emerald.[1] The police went around the block, and as they approached the Pontiac, six boys ran from the car. Five ran west toward Union Street, and the one boy in a white coat and black hat ran east toward Halsted. These occupants of the Pontiac were apprehended and some of them were placed in a lineup later that day which was viewed by Fannie Horton.

Stipulations were entered regarding the surgery performed on Gillie Horton as a result of his gun wound, and that his blood was type "B", the same type as that found on the white coat worn by Fain at the time of his arrest. It was also stipulated Fain was 17 years of age and Brown was 18.

Defendant Brown recalled Officer John McLeod who testified that on the evening of the incident Fannie did not give him a description of the clothing worn by the offenders. She merely indicated the offenders were three black male teenagers.

John Wilson, a Chicago police officer, testified on behalf of Brown regarding a conversation he had had with Gillie Horton at Englewood Hospital shortly after the incident. He testified Gillie was conscious at this time and aware of what he was saying. Gillie allegedly told the officer there were three persons involved in the robbery, number one a male, Negro, 5 feet 11, 140 pounds, dark complexion, wore a dark jacket and brown pants; number two, 16 or 17, 5 feet 11, dark complexion, wore dark clothing; and number three, about the same description as number two.

Catherine Fain, defendant's mother, testified she had never seen her son in the company of Edward Brown. On the evening of February 5, 1973, she saw Fain leave the house about 5:30 p.m. in a black jacket with fur around the collar and return in this same jacket about midnight. She admitted defendant owned a white coat, but that coat was allegedly hanging on a door in the house on the night of the alleged incident.

Amy Brown Badie, Fain's girl friend at the time of the incident, testified Fain was with her the entire evening of February 5, 1973, from 6:30 p.m. until midnight, except for a short while around 7:40 p.m. She testified he

---

[1] This court can take judicial notice of the fact (*Bruson v. Clark* (1894), 151 Ill. 495, 497, 38 N.E. 252) that all of the events referred to in the record took place within approximately 2½ city blocks.

was not wearing his white coat, but rather he wore a black jacket; and that she did see Fain playing with a gun that evening, but she did not know if it was real or a toy gun. On cross-examination the witness admitted she did not initially tell the investigating officers that Fain had left her house for any time on the night of the robbery, and she denied having omitted this information because she had been threatened by Fain. She further explained Fain was only gone for about ten minutes and was back by 8 p.m. She also related an incident which happened between herself and Fain on February 6, 1973, the day after the occurrence, when he was visiting at her apartment. They had a short quarrel, he was wearing his white coat at the time, and she threw her hair brush at him, hitting and injuring his hand.

Deborah Smith, a friend of Amy Brown Badie, testified she knew defendant Fain and was with him and Amy from about 8 p.m. until midnight on February 5, 1973. She claimed Fain was wearing a black jacket at the time.

Ezell Fain, Jr., defendant, testified he was at his girl friend's house on the evening of February 5, 1973; that he was wearing a black jacket; that he had taken his brother's toy gun with him and never owned or possessed a real gun; and he only left his girl friend's house for about ten minutes when he went to a pool hall across the street. He denied having any part in the incident with the Hortons near Englewood Hospital. He explained the bloodstain on his coat with a reference to the argument he had had with his girl friend on February 6, 1973, when she hit him with a hair brush which cut his hand. Later during defendant's case, it was stipulated that Fain's blood type was the same as that which was on his coat—type "B".

Ezell Fain, Sr. testified his son (defendant) left the house about 4:30 in the afternoon on February 5, 1973, and that he was wearing his black jacket. He further stated Fain returned about midnight in the same jacket.

On rebuttal the State called Officer James Moylan to the stand and Moylan testified he did not see any blood or cut on Fain's hand at the time of his arrest on February 6, 1973.

Ralph Miller, a Chicago police officer who had interviewed Amy Brown Badie, testified on rebuttal that Amy had told him she lied regarding Fain's presence at her house on the night in question because he had threatened to kill her. He also stated she had told him Fain was wearing a long white coat when he came to her house that night—not a black jacket—, and that he did not return to the house until about 8:30 p.m.

Richard Hutchings testified in rebuttal that he had seen defendant Fain on a prior occasion in the possession of a .22 rifle and a .22 revolver.

Defendant Fain once again took the stand in surrebuttal and showed

the jury where he had allegedly been injured by his girl friend. He also testified that at the time of the lineup, Officer Moylan looked at defendant's hand and immediately denied seeing any cut which Fain had allegedly asked him to look at.

## I.

■■ Defendants complain the trial court erred in allowing Officer McLeod to testify that during his initial investigation the evening of the incident, he visited the homes of the Rock and Warren families prior to returning to the police station to secure a photograph of defendant Brown. Defendants argue this was an attempt to place before the jury evidence that the Rocks and Warrens identified Brown as the offender without calling them to testify. Neither defendant objected to this line of questioning during the trial; therefore, any objection to this testimony as given by the officer was waived. *People v. Williams* (1963), 28 Ill. 2d 114, 116, 190 N.E.2d 809.

However, defendant Brown's counsel did object during closing argument when the State made reference to Officer McLeod's investigation at the Rock and Warren homes before returning to the police station for defendant Brown's picture. We must consider this argument in the context in which it was made. Defense counsel in closing argument referred to this testimony stating:

> "Officer McLeod said he then talked to Mrs. Rock and the Warren family. And we don't know what Mrs. Rock and the Warren family said to him. We don't know if they saw anything. * * * Why weren't they here? Because they didn't see anything. * * * Had they seen the boys that did this, they would have been here to tell you about it. But they didn't see anything, so they are not here."

In response the State argued:

> "Now, there was some comment about the failure of the Rocks and the Warrens and Lola to testify. And I agree with Mr. Silverman. * * * If Mrs. Rock could have added anything to this case, she would have taken that stand and testified. If Mr. Warren could have added anything to this case, he would have taken that stand and testified. Their names are only important insofar as locale. * * *
>
> Now the Rocks and Warrens are important because the investigator went to where the Rocks live, * * * near the gangway where the boys ran through. He had a conversation with them, and after having the conversation with them, he went across the street to the Warrens' house * * * and had a conversation with them.

And after having that conversation, he went to the 7th District Police Station to get a picture of Edward Brown."

Contrary to defendants' position, the above argument does not necessarily imply the Rocks and Warrens identified Brown as one of the robbers. Counsel for the defendant commented on the failure of Rock and Warren to testify. The State responded. Officer McLeod did testify that after talking to the Warrens and Rocks he returned to the police station to get a picture of Brown.

The cases relied on by defendants are inapplicable in this case because, unlike *People v. Beier* (1963), 29 Ill. 2d 511, 516, 194 N.E.2d 280, the prosecutor in this case confined his argument to facts in evidence; and unlike *People v. Donaldson* (1956), 8 Ill. 2d 510, 518, 134 N.E.2d 776 (Donaldson had been found guilty of murder and sentenced to death) or *People v. Lettrich* (1952), 413 Ill. 172, 180, 108 N.E.2d 488, the prosecutor is not attempting to get inadmissible or incompetent evidence, such as a coerced confession or a prior conviction or improper inferences before the jury. The prosecutor in the case at bar merely repeated the testimony of one of the investigating officers. That officer stated he talked with a few families that lived in the area where the crime was committed and then returned to the police station to secure a photograph of defendant Brown to show to Fannie Horton. He also secured five or six other photographs to show her. There was no testimony as to what those families told the officer.

The scope, substance, and style of a closing argument must be left to the discretion of the trial court who is in a superior position to determine the real effect of any statement which might be considered prejudicial. To reverse a case on the basis of comments in a closing argument, it must be evident that the improper remarks complained of influenced the jury in a manner that resulted in substantial prejudice to the defendant. (*People v. Stahl* (1962), 26 Ill. 2d 403, 406, 186 N.E.2d 349.) Under the circumstances of this case, we find no merit to the defendants' contention.

## II.

The defendants complain that the trial court erred by sustaining the prosecutor's general objections to questions asked by defense counsel. In their brief it is urged that "the trial judge frequently sustained the prosecutor's general objections to questions asked by defense counsel." In support of this general allegation, the brief chiefly refers to what took place when defendant Brown called as his witness Officer John Wilson. The gist of this testimony had to do with a conversation Wilson had with Mr. Horton in the hospital emergency room. At trial, counsel for Brown stated Wilson was being called to impeach the testimony of Mr. Horton. The State made numerous objections on the grounds that no adequate

foundation had been laid to impeach Mr. Horton. The trial court correctly pointed out to defense counsel in a sidebar conference that the proper procedure had not been followed in the examination of Mr. Horton to permit impeaching questions to be asked of Wilson. Nevertheless defense counsel continued to ask questions to which the State objected and the court sustained. No basis was stated by the State in making the objections or by the trial court in sustaining the objections.

At the outset it is to be noted that defendant Fain, pursuant to section 116—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 116—1), filed a written motion for new trial. This point was not urged by Fain in the motion. It is well-established law in this State that a defendant is limited on review to the errors alleged in a written motion for new trial and all other errors are deemed waived. (*People v. Hairston* (1970), 46 Ill. 2d 348, 367, 263 N.E.2d 840; *People v. Lipscomb* (4th Dist. 1975), 28 Ill. App. 3d 240, 241, 328 N.E.2d 37.) Therefore Fain waived this point.

■■ As to defendant Brown's contention that the trial court should have given a reason each time it sustained an objection, we find this to be without merit. In the only cited reference, Officer Wilson's examination, we have noted the trial court did initially explain its position to defense counsel. Having done so once, it is not necessary for either the State or the trial court to repeat the basis for an objection or ruling each time. Perhaps the ancient ritual of the State adding "same objection" and the trial court responding "same ruling" would have been consoling to defense counsel, but we see nothing to be accomplished or no record to be protected by so doing in this circumstance. Any reasonable person should have known the reason why.

■■ We agree with the general proposition cited by defendant Brown that the trial court should require the parties to specify the ground for their objections—especially if the ground for the objection can be obviated. (See *People v. Mandrell* (1923), 306 Ill. 413, 420, 138 N.E. 215; 34 Ill. L. & Pr. Trial §63 (1958).) Also, the trial court should ordinarily give a reason for its ruling where the grounds for exclusion could be remedied. (See 34 Ill. L. & Pr. Trial §71 (1958).) However, as we have already noted in the case at bar, the trial court adequately gave its reason for sustaining the State's objections to defendant's examination of Officer Wilson.

### III.

Richard Hutchings was called by the State as a rebuttal witness to impeach defendant Fain's testimony that he had never possessed or owned a gun. Hutchings testified he had seen Fain on a previous occasion (December 11, 1972) in the possession of a .22 rifle and a .22 revolver. Defendants now contend that three errors occurred with this testimony: (a) Hutchings had not been identified before trial as a potential witness;

(b) a rebuttal witness cannot impeach a defendant on a collateral matter; and (c) the testimony tended to indicate prior unrelated misconduct.

## A. and B.

■■ Defendants contend that Hutchings should not have testified since he had not been disclosed during discovery proceedings. However, as held in *People v. Stinson* (1st Dist. 1976), 37 Ill. App. 3d 229, 234, 345 N.E.2d 751, a party is not required to disclose a rebuttal witness until an intent is formed to call such witness. Such intent could not be formed in the case at bar until Fain took the stand and stated he had never owned or possessed a gun.

The State points out that Fain filed a written motion for new trial which did not include this point and therefore it is waived. We have earlier in this opinion held that failure to include an alleged error on a written motion for new trial constitutes a waiver. Upon the authority cited in section II, it is our opinion the points urged in (a) and (b) are waived.

## C.

■■ It is urged that evidence of Fain's prior possession of a gun was erroneous in that it was evidence of a prior offense. Although we think this point is also waived, it might be noted that there is no evidence that Fain was illegally in possession of those firearms. When witness Hutchings stepped down from the stand, the trial court said, "The officer—witness may step down." Upon objection by counsel for Brown, the trial court instructed the jury to disregard any statements of the court. We are satisfied that the trial court's use of the word "officer", changed immediately to "witness", was not prejudicial error—especially after the trial judge instructed the jury to disregard any statements of the court.

Even though we have held defendant Fain waived these points, we have reviewed the record and are satisfied there is no plain error affecting substantial rights of either defendant. We therefore find no basis to take any action pursuant to Supreme Court Rule 615 (Ill. Rev. Stat. 1973, ch. 110A, par. 615).

## IV.

Defendants strongly urge they were not proved guilty beyond a reasonable doubt. Acknowledging that their conviction rests primarily upon the identification of the two complaining witnesses, they point to a lack of corroboration as to Brown, that the introduction of the long white coat with bloodstains similar in type both as to Fain and Gillie Horton is worthless as to Fain, and the failure of the complaining witnesses to

describe the white coat to the police and other conflicts in the testimony, all raise a serious and well founded doubt of defendants' guilt. *People v. Sledge* (1962), 25 Ill. 2d 403, 407, 185 N.E.2d 262.

■■ In *Sledge* there were significant discrepancies between the complaining witnesses' trial and pretrial versions of essential and important connecting facts, leaving the evidence far short of having the clear and convincing character required to establish guilt beyond a reasonable doubt. In the case at bar each defendant was positively identified in court by both Hortons. The incident took place on a brightly illuminated street and lasted approximately 15 minutes. Within hours Mrs. Horton identified Brown, and she identified Fain at a lineup the following day. Based on all of the identification testimony, there is no question of there being more than enough evidence to support the jury's verdict of guilty as to each defendant.

The law is clear that a positive identification by a single witness with ample opportunity to observe is sufficient to support a conviction. (*People v. Williams* (1975), 60 Ill. 2d 1, 12, 322 N.E.2d 819.) If the identification is doubtful, vague, and uncertain, there is ground for reversal. *People v. Gardner* (1966), 35 Ill. 2d 564, 571, 221 N.E.2d 232.

Fain attempts to negate the impact of the evidence of the white coat with bloodstains of the same type as Gillie Horton, by explaining the bloodstains were from an injury inflicted on him by his girl friend, and that his blood type is the same as that on the coat—type "B". However, the jury is not bound to accept defendant's explanation; it can opt to believe the State's theory. *People v. Williams*, at 12; see *People v. Parker* (1976), 40 Ill. App. 3d 597, 352 N.E.2d 394.

But assuming, for the sake of argument, there is no other evidence (other than the identifications) against either defendant, we must look to the credibility of the identification evidence supplied by the Hortons. Defendants claim the inconsistencies in the testimony of both Gillie and Fannie Horton, as well as the impeaching evidence offered by other witnesses, make their identifications of defendants unbelievable. Gillie Horton claimed he gave no information to any police officers on the night of the incident. Officer Wilson claims Gillie described all three offenders to him immediately after the incident at Englewood Hospital. The officer noted Gillie was conscious and aware of what he was saying, yet gave descriptions which conflict with those given by him at trial and those given by his wife. Wilson testified that he received a call about 8:45 p.m. on February 5, 1973, to go to Englewood Hospital. When he arrived there about 9:05 p.m., he went to the emergency room where he saw Gillie Horton. In addition to the alleged descriptions, Gillie also told Wilson the incident had taken place about 8:50 p.m.—five minutes after Wilson was called to the hospital to investigate the matter. At 9:45 that evening, when

Officer McLeod arrived, Gillie was allegedly unable to hold a conversation.

Fannie's testimony stated she had described the clothing worn by the offenders on the night of the incident. Officer McLeod, the investigating officer, testified Fannie only gave him a general description of the offenders as three black male teenagers. Previously McLeod had testified Fannie was in an upset condition during this investigation.

Defendants claim the failure of the witnesses to give a description of the white coat allegedly worn by Fain prior to the lineup was impeaching evidence. Yet as required by *People v. Henry* (1970), 47 Ill. 2d 312, 320-22, 265 N.E.2d 876, this evidence was submitted to the jury for their consideration. The jury also had before it the fact that the Hortons had previously seen defendant Brown in the neighborhood and failed to call this point to the attention of the police.

It is also to be noted that the jury had before it conflicting testimony concerning the alibi witness called by defendant Fain. The girl friend of Fain testified that except for a brief period around 8 p.m., Fain was with her from 6:30 p.m. until midnight, and that he wore a black coat that night. After denying she had not told investigating police officers this story because she had been threatened by Fain, the State called Officer Ralph Miller who testified the witness told him she lied regarding Fain's presence because he had threatened to kill her.

From our review of the record we are satisfied that the evidence in the record is clear and convincing and supports the jury's verdict of guilty beyond a reasonable doubt as to each defendant.

## V.

■■ Finally, the State concedes defendants were erroneously convicted of two counts of aggravated battery arising out of a single act. (*People v. Lilly* (1974), 56 Ill. 2d 493, 495, 309 N.E.2d 1; *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 489, 292 N.E.2d 387.) Therefore each defendant's conviction for the two counts of aggravated battery should be vacated by this court since they were lesser included offenses of the offense of attempt murder.

As to each defendant, the judgment of the circuit court of Cook County is affirmed as to the count of armed robbery and the count of attempt murder, and vacated as to the two counts of aggravated battery.

Judgments affirmed in part and vacated in part.

STAMOS, P. J., and JIGANTI, J., concur.