THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY WRIGHT, Defendant-Appellant.

First District (5th Division)   No. 84—0302

Opinion filed August 29, 1986.

James J. Doherty, Public Defender, of Chicago (Dennis E. Urban, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Karen C. Wirth, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:
Following a bench trial the defendant, Larry Wright, was found guilty of rape, robbery and unlawful restraint. He was sentenced to concurrent imprisonment terms of 14 years for rape, 7 years for robbery and 3 years for unlawful restraint. Defendant's sole contention on appeal is that the evidence did not prove his guilt beyond a reasonable doubt and that his convictions must therefore be reversed. We set forth in detail the evidence as it was presented at trial.

### THE STATE'S EVIDENCE

PAMELA MCCULLOUGH
DIRECT-EXAMINATION
Pamela McCullough testified on direct-examination that she was 29 years of age. On Saturday, April 9, 1983, at about 3:30 in the afternoon, she was in Chicago on a bus en route to see a girlfriend.

She got off the bus at Roosevelt Road and St. Louis Avenue. She had not gone far from the bus stop when a man, who she identified as the defendant, came behind her and grabbed her. She was asked to show the court how the defendant grabbed her and she indicated with her arms crossed in front of her body. McCullough testified as follows:

"Q. What did you do when the man grabbed you from behind?

A. We were having an argument *** I told him to let me go.

Q. What did he say?

A. He said b----, I'm not going to let you go, you go with me.

Q. How long did this argument last?

A. For a long time.

Q. [D]id you do anything physically in your argument?

A. Yes, I was trying to struggle.

Q. How were you struggling, what were you doing?

A. Pushing."

McCullough was unsuccessful in breaking away from the defendant. She was 5 feet 1 inch tall and weighed 112 pounds. The defendant was much taller.

A second bus came and McCullough asked the driver, "Will you contact the police because this man just grabbed me and I don't know who is he." The bus driver did not respond. The defendant told the bus driver that she was his girlfriend and that she was going with him. The bus driver drove away.

The defendant held McCullough by her left wrist and he pushed and pulled her. She struggled to get away but was unable to do so as the defendant pulled her down Roosevelt Road. McCullough saw a man coming across the street and asked him, "Would you please call the police because this man just grabbed me and I don't know who he is." The man did not help her. The defendant said, "This is my girlfriend, you go mind your own business." McCullough testified that the defendant said that he was going to "bust my head and shoot me." She said she never saw a gun. The defendant took her down St. Louis Avenue. McCullough said she did not see anybody on that street whom she could ask to help her.

The two then went down Central Park Avenue to a building with two blue doors. The doors were open and the defendant pushed McCullough through the doors into the building and down about three stairs. The defendant pushed her onto her back on the stairs and lay on top of her. She was unable to get up. He unzipped her coat and

took it off. He then unzipped her blue-jean pants, took her leg out of her pants and put his penis into her vagina. McCullough was not married to the defendant, she was not there of her own free will and she did not consent to this act of intercourse.

The defendant then took her out of the building by holding her by her wrist. He took her down 16th Street and stated to her, "B----, I'm going to kick your ass and I'm still going to bust your head and you're going to be mine."

They walked down 16th Street. The defendant still had her by her wrist. He asked her if she had any money. She told him no, but that she had $6 in her back pants pocket. The defendant put his hand in her pocket and took her money. They walked to a liquor store and went inside, where, McCullough testified, she tried to whisper to the female clerk:

"Q. What did you try to whisper to her, Pam?
A. Will she contact the police because this man just raped me."

The clerk was behind the counter. McCullough was on the outside of the counter, across the counter from the clerk. The defendant was standing next to McCullough when she tried to whisper to the clerk. The clerk did not respond when she whispered but walked to the other end of the counter. Somebody knocked on the window. The clerk did not come back and ask McCullough what she was trying to say to her. The defendant used McCullough's money to pay for beer.

The defendant and McCullough left the liquor store. The defendant was holding her by her wrist. They again walked down Central Park Avenue to the same building with the two blue doors. The defendant forced McCullough to drink some of the beer. He put the bottle up to her mouth and held the bottle as the beer went down her throat. The defendant then pulled and pushed McCullough by her wrist, throat and collar through the doors. She and the defendant again went to the stairway where the defendant again unzipped her coat, again pulled down her pants and again put his penis into her vagina. This second act of intercourse was also without her consent.

After this second act of intercourse, the defendant held McCullough by her wrist and they again walked down 16th Street to another liquor store. There was a lady in this liquor store also.

Testifying further on direct-examination, McCullough stated:

"Q. Alright, what did he say.
A. He told the lady that I was his girlfriend.
Q. And did you say anything?
A. I said, no, I was shaking my head no.

> Q. Did he say or do anything?
>
> A. He pulled me out the store."

When the defendant pulled McCullough out of the second liquor store, she and the defendant went down 16th Street to a playground. She testified that she did not remember where the playground was or how far it was from the second liquor store. It was getting dark outside and there were children on the playground playing basketball. McCullough testified:

> "Q. Was there any conversation between the defendant and any of the kids?
>
> A. Yes.
>
> Q. Tell the judge about that.
>
> A. The kids were saying 'Man let that lady go, you, know, why are you beating her up. Leave her alone.'
>
> Q. And what did he say?
>
> A. You mind your own business.
>
> Q. Before the kids started saying that, what was the defendant doing over there by the wall with you?
>
> A. He was drinking some wine."

The defendant did not let her go. About 20 minutes later, a marked police car with two uniformed policemen arrived. The defendant let McCullough go and she walked around him to the police car. She testified:

> "Q. What did you say to the police?
>
> A. I told them could you please help me, this man just kidnapped me.
>
> Q. Okay, what did the police do?
>
> A. They got out of the car and they put the handcuffs on him.
>
> Q. Now did you identify Larry Wright as a man who had kidnapped you?
>
> A. Yes.
>
> Q. Did you tell the police about any other crimes that he had committed against you?
>
> A. Yes.
>
> Q. What did you tell them?
>
> A. I told them he raped me."

That night, McCullough was taken by the police officers to Mt. Sinai Hospital and had a full physical examination, including a pelvic examination. She then went with the police to the building with the two blue doors.

CROSS-EXAMINATION

Testifying on cross-examination about when she and the defendant were in the playground before the police arrived, McCullough stated:

"Q. And you had been fighting, is that right?
A. Yes."

The boys who were playing basketball in the playground asked the defendant what he was doing to McCullough. The defendant told them that they should mind their own business. McCullough testified:

"Q. Now you didn't call out to those boys playing basketball did you?
A. No.
Q. You didn't tell them that this man had just raped you did you?
A. No.
Q. And you stated that you had been in the playground about 20 minutes before the police arrived, is that correct?
A. Yes.
Q. And when they arrived the first thing you told them was this man had just kidnapped you, is that correct?
A. Yes."

The first time McCullough saw the defendant was when he grabbed her when she stepped off the bus. About 10 minutes later another bus pulled up. McCullough and the defendant were still standing on the corner of St. Louis Avenue and Roosevelt Road. Roosevelt Road is an east and west street and St. Louis Avenue is a north and south street. There were stores on Roosevelt Road and there was traffic going back and forth. McCullough told the bus driver that the defendant had grabbed her and asked him to call for help. The bus driver did not do so and drove away. McCullough did not attempt to get on the bus. The defendant and McCullough walked down Roosevelt Road until they got to Central Park Avenue. McCullough testified:

"Q. Now he didn't have a gun on him did he?
A. No.
Q. He wasn't carrying a knife was he?
A. No.
Q. All he had was your umbrella, is that right?
A. Yes.
Q. But he didn't strike you with that umbrella, did he?
A. No, he pushed me."

When the defendant and McCullough reached Central Park Avenue, they walked south. There were no people on the street.

They arrived, for the second time, at the building with the two blue doors at about 6 o'clock that evening. McCullough stated:

"Q. Prior to that time you and Mr. Wright were still walking up and down the street on the west side, is that correct?

A. Yes.

Q. During the time Mr. Wright was drinking wasn't he?

A. Yes.

Q. And you were drinking too, weren't you?

A. Yes.

Q. He was drinking from a bottle, is that correct?

A. Yes.

Q. He had that bottle in his hand once in a while, didn't he?

A. Yes.

Q. He also had the umbrella?

A. Yes.

Q. What did he do with the umbrella?

A. He had the umbrella and he had me by my wrist.

Q. The alcohol he was drinking came from a bottle, is that right?

A. Yes.

\* \* \*

Q. In fact the two of you stopped into at least two liquor stores, is that correct?

A. Yes.

Q. And in both of these liquor stores there were people inside, is that right?

A. Yes.

Q. In fact there were also people outside the liquor store too weren't there?

A. Yes.

Q. And there was a woman behind the counter in each liquor store wasn't there?

A. Yes.

Q. And yet you never called out to either one of those women and said 'Help me, this man just raped me.'?

A. I did.

Q. You called out to her?

A. I whispered to her.

Q. But did you call out to her?

A. No.

\* \* \*

Q. Did you tell her that someone had raped you other than

in a whisper?
A. No.''

McCullough cried out to the people in front of the liquor store that the defendant had just raped her. These people did not help her. She pushed away from the defendant when she called out to these people and as they continued walking. Testifying further on cross-examination:

"Q. In any event, you went to this apartment building a second time. You didn't at that time call out, did you, to anyone?
A. No.
Q. You didn't scream?
A. Yes.
Q. You screamed when you were in the building?
A. I was fighting.
Q. You were fighting, you were making noise, is that right?
A. Yes.
Q. And you were screaming?
A. Pushing.
THE COURT: Ma'am, sorry. The question is were you screaming.
THE WITNESS: Yes.''

McCullough did not approach the police at the playground until after they had pulled up in their squad car. She did not see any police officers during the entire four hours that she was walking down St. Louis Avenue, Roosevelt Road or Central Park Avenue. The argument with the defendant in the playground did not result from her drinking with him and the argument was not over the fact that the defendant used her money to buy the liquor.

MICHAEL EGAN

Michael Egan testified on direct-examination that he was a police officer and that on April 9, 1983, he was assigned to a patrol unit in the 10th district, which included 418 South Central Park Avenue and the intersection of Roosevelt Road and St. Louis Avenue.

At about 7 or 7:15 p.m. on April 9 he responded to a call of a "disturbance" at 1458 South Lawndale, a school playground. Upon arrival he and his partner, Officer Doyle, noticed a large group of boys playing basketball. A short time later McCullough walked to the car. She said she had been kidnaped. Egan testified:

"Q. What did you do when she said that?
A. We got out of the car and my partner was starting to talk to her when the offender, Larry Wright, came up to the

car. He asked the defendant, Larry Wright, what was going on over here, that they had gotten a call.

Q. What did he say?

A. He said him and his girl friend, they were arguing.

Q. At that point did someone else join the conversation?

A. His father came up to the car."

Officer Doyle then came over and said to Egan in a very low tone that the victim said she had been raped by the defendant. Egan testified further:

"Q. All right. Armed with that information, did you confront the defendant with that information?

A. No. At first we just put the handcuffs on him, put him in the back of the car until we found out exactly what was going on at the time.

\* \* \*

Q. The question, sir, is did you confront him with the allegation that he had committed a rape? Did you tell him that's what he was suspected of doing?

A. Not in the very beginning, no.

Q. Did you eventually tell him?

A. Yes.

Q. And what did he respond to you when you told him that?

A. He said that it was his girl friend and that he was just arguing with her.

Q. All right. When he said that did you ask him any more questions?

A. Yes. We asked him, well, if it is your girl friend, what's her name.

Q. And what did he respond?

A. He did not know the girl's name."

On cross-examination, Officer Egan testified that when he and his partner arrived the defendant came over to the squad car. The defendant did not resist arrest. In fact, he just walked up to the car. Egan said that the call he received did not indicate that there was a rape in progress, or that a rape had been committed.

After Officer Doyle spoke with McCullough, they took her to the hospital.

On redirect examination Egan testified that the defendant's father told him that a friend of the defendant's came to his home and told him that his son was "beating up on somebody in the playground" and he called the police.

It was stipulated that if Chicago police detective McNulty were

called to testify, he would state that he and McCullough toured the area, that McCullough identified 1418 South Central Park Avenue as the building in which the defendant had taken her, that McNulty and McCullough entered the middle stairwell of the building, and that in the basement of the building McNulty found the top of an umbrella handle which McCullough identified as her umbrella.

It was further stipulated that if Dr. Basico were called to testify he would testify that he was a physician, that on April 9, 1983, he was employed at Mt. Sinai Hospital and examined Pamela McCullough, that she came to the hospital at about 7:56 p.m. on that date and that he observed a horizontal erythematous, an inflammatory redness of the skin on her lower back. He conducted a routine pelvic examination and "his external pelvic examination revealed abrasions at the posterior fourchette, the portion on the outside of a woman's vagina where there is the line of union of the interportion of the labia majora and the undersurface of the glans clitoris—the top of the vagina opening, and that the internal pelvic examination revealed a whitish discharge."

THE DEFENDANT'S EVIDENCE

BARBARA WILSON

Barbara Wilson testified on direct examination that she lived in Chicago and that the defendant was her brother. On April 9, 1983, she was at home and saw the defendant between 12:30 and 1 p.m. in front of their house. The defendant was with a young lady who was about 5 feet 2 or 5 feet 3 inches tall and light complected. Wilson testified that the young lady wrote something on a piece of paper, handed it to the defendant, that she went across the street and that the defendant called her back. When the young lady came back, she and the defendant talked for a minute and then the defendant walked off. The defendant was not holding the lady by her wrist. He did not have his hands on her. Wilson said she had not seen that lady before and has not seen her since that day.

CHARLIE WRIGHT

Charlie Wright next testified that he was the defendant's father and that the defendant lived with him. On April 9, 1983, Mr. Wright was home all day. At approximately 7 o'clock that evening he was doing his laundry when someone rang the doorbell and said for him to come out and stop the defendant because he was beating a young lady. Mr. Wright turned off the washing machine, put his clothes on

and called the police and told them he would meet them in the school playground, which was about 350 feet away. When he arrived at the school playground the police were already there. He told the police to take the defendant into custody and charge him with anything they thought would keep him in custody that night because he did not want his son on the street because Sunday he was going to have a program at church and wanted to rest Saturday night.

LOUISE WRIGHT

Next to testify was the defendant's mother, Louise Wright. She said that her son lived with her. She saw the defendant on April 9, 1983. The defendant was with a girl who was about 5 feet 3 inches tall. The defendant and the girl were coming out of a liquor store at Hamlin and 16th streets. They walked down the street to a game room and as they were about to enter it, the defendant's mother called the defendant. The defendant and the girl came over and the defendant's mother argued with the defendant about drinking. The defendant was "half drunk" and she told him that he could not come into the house drinking because they would put him out. The defendant had a bottle and he and the girl were "hugged up" with their arms around each other walking down the street. The girl did not attempt to push the defendant away. The girl said, "I haven't saw Larry in a long time and I would like to be with him." The defendant's mother told the defendant, "If this is your girl friend, why do you want to have her on 16th Street?" The defendant told her he was getting off the corner now. The defendant and the girl "hugged up" and walked down the street. That was the last time the defendant's mother saw him.

On cross-examination, Mrs. Wright testified that she had never seen that girl before. Her son got into a lot of fights on 16th Street and that was why she asked him why would he take his girl down there. She testified:

"THE COURT: What time did you say you saw your son?
THE WITNESS: That day?
THE COURT: Yes.
THE WITNESS: 3:00."

It was stipulated that if Chicago Police Detective McNulty were called to testify, he would testify that following his interview of McCullough he spoke to several occupants of the building where the umbrella handle was recovered, but that nothing unusual was seen or heard by anyone. It was further stipulated that if Jean Buliak, a microanalyst of the Chicago police department, criminalistics division,

were called to testify, she would testify that she conducted a microscopic examination of a vaginal smear specimen taken from McCullough which did not reveal the presence of spermatozoa.

The trial court found the defendant guilty of rape, robbery and unlawful restraint. We reverse.

Rape is defined in section 11—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 11—1(a)): "A male person of the age of 14 years and upwards who has sexual intercourse with a female, not his wife, by force and against her will, commits rape." Robbery is defined in section 18—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 18—1(a)): "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." Unlawful restraint is defined in section 10—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 10—3(a)): "A person commits the offense of unlawful restraint when he knowingly without legal authority detains another."

It is the defendant's contention for reversal that the evidence did not establish his guilt beyond a reasonable doubt. In this regard, many cases in this State are instructive in deciding this issue. In *People v. Dougard* (1959), 16 Ill. 2d 603, 607, 158 N.E.2d 596, in reversing a burglary conviction because of the insufficiency of the evidence, the court held that in criminal cases it is the duty of a reviewing court to review the evidence and if there is not sufficient credible evidence, or if the evidence is improbable or unsatisfactory, is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that the defendant is guilty, the conviction will be reversed. The court further pointed out in *Dougard* that it is also the duty of the reviewing court to resolve all facts and circumstances in evidence on the theory of innocence rather than guilt if that reasonably may be done, and where the entire record leaves a grave and substantial doubt of the guilt of the defendant, the court will not hesitate to reverse the conviction.

In reversing the defendant's rape conviction because the evidence was insufficient to establish guilt beyond a reasonable doubt in *People v. Rossililli* (1962), 24 Ill. 2d 341, 347, 181 N.E.2d 114, the court stated that in a rape case, unless the testimony is clear and convincing, the testimony of the complaining witness must be corroborated by other facts and circumstances in evidence.

The court also reversed the rape conviction in *People v. Scott* (1950), 407 Ill. 301, 305, 95 N.E.2d 315, because of the insufficiency of the evidence. The court held that it is a fundamental rule that in

order to prove the charge of forcible rape, there must be evidence to show that the act was committed by force and against the complainant's will, and that if she has the use of her faculties and physical powers the evidence must show such resistance as will demonstrate the act was against her will. If the evidence does not support an inference that the complainant was so paralyzed by fear or overcome by physical force that she was powerless to resist, the rape conviction must be reversed.

In reversing the defendant's conviction of rape, deviate sexual assault and robbery in *People v. Anderson* (1974), 20 Ill. App. 3d 840, 847-48, 314 N.E.2d 651, on facts strikingly similar to the facts in the case at bar, the court stated:

> "It is fundamental that in order to prove the charge of forcible rape there must be sufficient evidence to demonstrate that the act was committed by force and against the will of the female. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865; *People v. De Frantes* (1965), 33 Ill. 2d 190, 210 N.E.2d 467.) \*\*\*
>
> Reviewing courts are especially charged with the duty of carefully examining the evidence in rape cases. Moreover, in such cases it is the duty of a reviewing court not only to carefully review the evidence, but to reverse the judgment if that evidence does not remove all reasonable doubt and create an abiding conviction that the defendant is guilty of the crime alleged. (*People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211; *People v. Barfield* (1969), 113 Ill. App. 2d 390, 251 N.E.2d 923.) The ultimate issue presented in the instant case is not that of credibility, but whether the evidence introduced by the State, even if believed is sufficient to create an abiding conviction that the defendant is guilty of intercourse with the complainant by force and against her will."

The defendant's rape conviction, again on facts strikingly comparable to those in the case before us, was reversed in *People v. Taylor* (1971), 48 Ill. 2d 91, 98, 268 N.E.2d 865. The court stated:

> "The rules governing a determination of force in rape cases, and the review thereof, have been reiterated on a great number of occasions. \*\*\* [R]eviewing courts are especially charged with the duty of carefully examining the evidence in rape cases, and it is the duty of the reviewing court not only to consider the evidence carefully but to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty of the crime charged."

An analytical evaluation of the State's evidence reveals that it failed

to establish beyond a reasonable doubt that the defendant committed the offense of rape, robbery and unlawful restraint. We review the State's evidence.

At about 3 o'clock in the afternoon on Saturday, April 9, 1983, Pamela McCullough got off a bus at Roosevelt Road and St. Louis Avenue in Chicago. Although it is not established by the evidence, it can be inferred that the bus was a Chicago Transit Authority bus. The evidence established that Roosevelt Road is an east and west thoroughfare and the court can take judicial notice that Roosevelt Road is 1200 south. The evidence also established that St. Louis is a north and south street and the court can take judicial notice that St. Louis Avenue is 3500 west. *People v. Fain* (1976), 41 Ill. App. 3d 872, 876, 355 N.E.2d 61.

McCullough testified that the defendant, a stranger, grabbed her from behind. She and the defendant engaged in what McCullough described as "an argument," which lasted for what she said was "a long time." She struggled and pushed the defendant. She was 5 feet 1 inch tall and weighed 112 pounds. McCullough testified that "the defendant was much taller." The record does not reveal how "much taller." McCullough told the defendant to let her go. He refused and told her that she was going with him. She and the defendant stood on the corner of Roosevelt Road and St. Louis Avenue for about 10 minutes, during which time there was "traffic back and forth."

It is difficult to conceive that an unknown assailant would grab a potential rape and robbery victim who alighted from a public bus on a Chicago street corner traveled by Chicago Transit Authority buses and other traffic, and there struggle with his victim for 10 minutes until another bus arrived. The defendant was unarmed and did not strike, beat or hit McCullough, nor did she strike, scratch, kick or bite him. The defendant did not threaten McCullough with physical harm. According to McCullough, the defendant simply held her by her wrist. She described this struggle with the defendant as "pushing."

McCullough said that when the second bus arrived, she asked the driver, "Will you contact the police because this man just grabbed me and I don't know who he is." Under these circumstances, this would seem to be a rather unusual protest or outcry. McCullough did not attempt to get on the bus. According to her, the defendant told the bus driver that she was his girlfriend and that she was going with him. The bus driver did not say anything and drove off.

The defendant did not know nor did he have any way of knowing whether the bus driver would or did call the police. Yet, the defendant held McCullough by her wrist and pulled her down Roosevelt Road.

McCullough testified that she asked a man who was coming across the street to call the police "because this man just grabbed me and I don't know who he is." Under the circumstances that McCullough related, it would appear to be unlikely that she would disclaim acquaintance with the defendant in this manner. But, according to her, she said this to the man from whom she was seeking assistance *before* the defendant told the man that she was his girlfriend and for him to mind his own business. The defendant did not know nor had any way of knowing whether this man would summon the police for McCullough. Yet the defendant, according to McCullough, continued to forcibly take her down Roosevelt Road.

After these two unsuccessful attempts for help by McCullough, the defendant told her that he would "bust [her] head and shoot [her]." She never saw the defendant with a gun or any other weapon.

McCullough, after suggestive and prodding questions, belatedly testified that she had an umbrella when the defendant accosted her and that the defendant took it from her. She further testified that the defendant, while holding the umbrella and while holding her by her wrist, "pushed" her along Roosevelt Road from St. Louis Avenue to Central Park Avenue. Although the record does not reflect the distance from St. Louis Avenue to Central Park Avenue, the court can take judicial notice that Central Park Avenue is 3600 west, and a block from St. Louis Avenue. *People v. Fain* (1976), 41 Ill. App. 3d 872, 876, 355 N.E.2d 61.

The defendant and McCullough walked south on Central Park Avenue to a building that McCullough described as having two blue doors. This was an occupied apartment building at 1418 South Central Park Avenue, two blocks south of Roosevelt Road and St. Louis Avenue, where McCullough said the defendant accosted her.

The court pointed out in *People v. Anderson* (1974), 20 Ill. App. 3d 840, 848, 314 N.E.2d 651, that "[i]t is doubtful that an attacker could brazenly accost a victim in broad daylight, then successfully spirit that victim across an admittedly busy street in a forcible manner without attracting the attention or intervention of anyone. It is also incongruous that [the] complainant would refrain from making an outcry because of fear of defendant's gun, but would not refrain from engaging in a veritable wrestling match such as she described as occurring between herself and defendant before they entered the apartment building."

McCullough testified that the defendant pushed her through the two blue doors and into the building, down about three stairs and then pushed her onto her back on the stairs. There is not one scintilla

of evidence that the defendant beat or hit her or that he displayed any weapon to her. Nor is there any evidence that McCullough screamed, yelled, or resisted the defendant. McCullough was wearing a down coat which had a zipper. According to her, the defendant unzipped her blue-jean pants, took her leg out of her pants, pulled up his coat, lay on top of her and had intercourse with her with force and against her will.

These facts closely parallel the facts in *Anderson* where the court reversed the defendant's rape conviction and stated, "After the careful scrutiny of the State's evidence which is required of a reviewing court, we hold that evidence insufficient to remove all reasonable doubt and to create an abiding conviction that the alleged acts of intercourse engaged in by complainant and defendant were performed by force and against her will." *People v. Anderson* (1974), 20 Ill. App. 3d 840, 850, 314 N.E.2d 651.

In *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865, the complainant claimed that the defendant threatened her with a gun in a shopping-center parking lot. She admitted she never saw the gun but that she was paralyzed by fear. The defendant forced her into his car, drove through well-traveled streets for 35 to 40 minutes and raped her. In reversing the rape conviction, the court stated:

> "The rules governing a determination of force in rape cases, and the review thereof, have been reiterated on a great number of occasions. *** [T]he degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case; that resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female as where the assailant is armed with a deadly weapon, and that proof of physical force is unnecessary if the prosecuting witness was paralyzed by fear or overcome by superior strength of her attacker; that it is, however, fundamental that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she had the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will." *People v. Taylor* (1971), 48 Ill. 2d 91, 98, 268 N.E.2d 865.

After this act of intercourse, McCullough testified, she put on her pants and coat and the defendant took her out of the building, again, while holding her by her wrist. The defendant took her down 16th

Street which is 1½ blocks from the building in which the intercourse occurred and which is over 5 blocks from where McCullough said she was initially abducted. McCullough stated that as she and the defendant walked down 16th Street, the defendant told her, "I'm going to kick your ass, and I'm going to bust your head and you're going to be mine."

As McCullough and the defendant walked down 16th Street, the defendant continued to hold McCullough's wrist. The defendant asked her if she had any money and McCullough told him that she did not. The defendant put his hand in her pocket and took $6. They walked to a liquor store.

For an unarmed rapist to accompany his rape victim in the afternoon down public streets to a liquor store is incredible. The conduct of McCullough, the alleged rape victim, after she entered the liquor store, is even more incredulous. She testified that she attempted to whisper to the female liquor-store clerk who was behind the counter to contact the police because the defendant had just raped her. It would certainly seem that McCullough would have screamed to the clerk, but she did not. There is no evidence that she was crying or was emotionally distraught. Moreover, had the defendant just performed the despicable acts McCullough said he did, the defendant would not have known that McCullough would not cry out for help while she was in the liquor store. It is highly unlikely, improbable and unbelievable that the defendant would have escorted McCullough into a liquor store if he had committed the acts which McCullough claimed he did.

McCullough's narration of the events has greater value as fiction than as credible evidence. (*People v. Coulson* (1958), 13 Ill. 2d 290, 295, 149 N.E.2d 96.) McCullough's testimony taxes the gullibility of the credulous and is reminiscent of the complainant's testimony in *Coulson.* In *Coulson,* the complainant testified that the offenders took his wallet at gun point and then accompanied him to his home on his vague promise that he would give the robbers more money. The offenders permitted the complainant to enter his home while they waited outside for him to return with the additional money, trusting that he would not seek aid or call the police. The supreme court reversed the robbery convictions and stated, "Where testimony is contrary to the laws of nature, or universal human experience, this court is not bound to believe the witness." 13 Ill. 2d 290, 297, 149 N.E.2d 96.

The scenario of events in the case before us becomes more far-fetched and improbable as they were told by McCullough. She stated

that the defendant purchased beer in the liquor store and that he used her money to pay for the beer. She was not asked how the defendant simultaneously held her, paid for, received and held the beer. According to her testimony the defendant accomplished this feat and they left the liquor store while the defendant held her by her wrist and held the beer at the same time.

They returned to the 1418 South Central Park Avenue building. En route, the defendant forced McCullough to drink some of the beer. The record does not disclose how the defendant performed the difficult task of opening the beer bottle while he held McCullough. After he accomplished this, McCullough testified, the defendant held the beer bottle to her mouth as the beer went down her throat. The defendant again pushed and pulled her by her wrist, again forced her through the door of the building, again forced her down the stairway where he again unzipped her coat, again pulled down her pants and again had intercourse with her, again against her will and without her consent.

McCullough said that after this second forcible act of intercourse the defendant, while still holding her wrist, took her to another liquor store. There was a female clerk in this second liquor store. The defendant told the clerk that McCullough was his girlfriend. McCullough shook her had "no." McCullough again did not scream or cry out for help. There was no evidence that McCullough was crying or that she was distraught. In his second liquor store the defendant purchased a bottle of wine.

McCullough's testimony is similar to the complainant's testimony in *People v. O'Connor* (1952), 412 Ill. 304, 106 N.E.2d 176, where the alleged rape victim testified that after the rape attacks, the defendants accompanied her to various taverns where many people were present. The court held that such testimony was too improbable and unconvincing to sustain a rape conviction. McCullough's testimony is also comparable to the complainant's testimony in *People v. Buchholz* (1936), 363 Ill. 270, 2 N.E.2d 80 and *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801, where the alleged rape victims testified that after they were raped, the defendants accompanied them home. In *Buchholz* and *Kepler*, the court reversed the rape convictions and held that the testimony was too bizarre to be credible and therefore failed to establish guilt beyond a reasonable doubt.

The defendant pushed McCullough out of the second liquor store and she cried out to the people who were in front of the liquor store that the defendant had raped her. No one came to her aid. If McCullough's testimony is to be believed, the defendant would not

know if the persons to whom McCullough addressed her plea would call the police. Yet the defendant did not flee. Instead, he took McCullough down 16th Street to a school playground where a group of boys were playing basketball. McCullough did not cry out or mention to these boys that the defendant had raped her. This playground was only 350 feet from the defendant's home. The boys in the playground knew the defendant, his parents and where they lived.

McCullough testified that at this point, the defendant drank some wine. She and the defendant began fighting. The boys in the playground admonished the defendant to cease his altercation with McCullough. The defendant told the boys to "mind your own business." It was about 7:30 p.m. and McCullough had been with the defendant for at least four hours.

The evidence established that a friend of the defendant went to the defendant's home and told the defendant's father, "that his son was beating up some lady in the playground." The defendant's father called the police.

McCullough testified that she and the defendant had been on the playground about 20 minutes when two uniformed police officers arrived in a squad car. She stated that when the car pulled up the defendant let her go and that she walked around the defendant to the police car. She did not tell the officers that the defendant had twice raped her. She stated to the officers, "Could you please help, this man kidnapped me." McCullough testified that the officers got out of their squad car and handcuffed the defendant. McCullough was then asked, "Did you tell the police about any other crimes that he had committed against you?" She answered, "yes." The next question was, "What did you tell them?" She responded, "I told them he raped me."

The defendant's conduct when Officers Egan and Doyle arrived at the playground raises a doubt about his guilt. Officer Egan testified that shortly after they arrived, McCullough walked to the squad car and said she had been kidnaped. The defendant did not flee and made no effort to do so. Officer Egan testified the defendant also walked over to the squad car. Egan asked the defendant what was going on because they had gotten a disturbance call. The defendant responded that he and his girlfriend were arguing. The officers took the defendant into custody.

The officers also took McCullough to the hospital where she was examined by a physician. The examination revealed a "horizontal erythematous—an inflammatory redness of the skin on [her] lower back." The record is silent on when, where or how McCullough received this skin inflammation. We are left to infer that it was inflicted when she

was on her back on the stairs twice having intercourse with the defendant. This inference falls far short of corroborating McCullough's testimony that the acts of intercourse were with force. Indeed, the horizontal skin inflammation on McCullough's back could have occurred if the intercourse was consensual. The same is true regarding the abrasions on McCullough's vagina discovered by the examining physician. See *People v. Symons* (1961), 23 Ill. 2d 126, 130, 177 N.E.2d 185, and *People v. Grudecki* (1940), 373 Ill. 536, 540, 27 N.E.2d 51, where the court reversed the defendant's rape conviction and pointed out that the evidence merely established that an act of sexual intercourse had occurred.

Besides those mentioned, McCullough had no other bruises or injuries although she claimed she was pulled, pushed and shoved along several streets, twice into a building where she said she was twice raped, into two liquor stores and onto a school playground, for a period of over four hours. She said that the defendant continuously held her wrist during this ordeal. Yet there was no evidence of any swelling, soreness, bruises or tenderness to her wrist. There was no evidence that her clothing had been torn, ripped or even disheveled even though, according to her testimony, she and the defendant fought on the school playground. See *People v. Szybeko* (1962), 24 Ill. 2d 335, 340, 181 N.E.2d 176, where the complainant testified that she had been raped but, the court noted, her bloodstained dress was not introduced as corroborative evidence.

McCullough stated that when she was initially accosted by the defendant at the bus stop she had an umbrella which the defendant forcibly took from her as he pulled her by the wrist down the street to the building where the rapes occurred. She was not asked to explain how the defendant pulled her while simultaneously carrying her umbrella. She claimed that after the defendant's arrest the police officers took her to the building and that she pointed out the top of her umbrella to the officers. The umbrella top was not offered into evidence, nor was its absence explained.

The acts of intercourse occurred in a multiple apartment residential building. Although McCullough claimed that she screamed only on the second occasion when she was there, her testimony in that regard is not clear and convincing:

"Q. In any event, you went to this apartment building a second time? You didn't at that time call out, did you, to anyone?
A. No.
Q. You didn't scream?
A. Yes.

Q. You screamed when you were in the building?

A. I was fighting.

Q. You were fighting, you were making noise, is that right?

A. Yes.

THE COURT: Ma'am sorry. The question is were you screaming?

THE WITNESS: Yes."

Investigating officer McNulty testified that he spoke to several occupants of the building but that no one saw or heard anything unusual. No one from the apartment building testified to corroborate McCullough's testimony that she made an outcry, nor were either of the liquor-store sales clerks called to testify, none of the persons who were in front of the second liquor store testified, nor did either of the two Chicago Transit Authority bus drivers who McCullough referred to in her testimony.

The State's evidence did not prove beyond a reasonable doubt that the defendant committed the offense of rape. The defendant was also convicted of the offenses of robbery and unlawful restraint. As the court held in *People v. Anderson* (1974), 20 Ill. App. 3d 840, 851, 314 N.E.2d 651, "[W]hether or not the property of complainant was taken by force, or the imminent use of force, is dependent upon the same evidence that would establish that the acts of intercourse and deviate sexual conduct were committed by force. In view of our reversal of the other convictions, we conclude that defendant was not proved guilty of robbery, and accordingly reverse." Likewise, in the case at bar, whether or not McCullough's property was taken by force or whether or not she was unlawfully restrained was dependent upon the same evidence that the acts of intercourse with the defendant were committed by force. We therefore reverse the defendant's robbery, unlawful restraint and rape convictions.

Reversed.

SULLIVAN, P.J., and LORENZ, J., concur.