THIRD DIVISION
June 18, 2008

No. 1-05-2791

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04CR10540 |
| | ) | |
| PEDRO SALINAS, | ) | The Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial, defendant Pedro Salinas was convicted of unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(D) (West 2004)) and sentenced to 10 years' imprisonment.  On appeal, defendant seeks reversal of his conviction, asserting that the trial court erred in denying his pretrial motion to quash arrest and suppress evidence because: (1) the traffic stop that resulted in the seizure of the controlled substance violated his constitutional right to be free from unreasonable searches and seizures; and (2) the trial court improperly relied on evidence outside the record in delivering its ruling.  We affirm.

Following a narcotics surveillance operation, defendant was charged with possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2004)) when police officers recovered 5,118 grams of cocaine from defendant's vehicle on April 1, 2004.  The surveillance operation also resulted in the arrests of codefendants Carlos Ayala and Tomas Cantuo, who were also charged with narcotics offenses.

Prior to trial, defendant, through counsel, filed a motion to suppress, seeking to suppress the cocaine the police recovered from his vehicle, contending that the search and seizure violated

his fourth and fourteenth amendment rights to be free from unreasonable searches and seizures. In his motion, defendant argued that at the time police stopped his car for an improper lane change, "the police did not possess probable cause to arrest, or a reasonable suspicion to support a 'Terry' stop." Nonetheless, defendant contended that police ordered him out of the vehicle, handcuffed him, and "performed a full search of the vehicle," during which they recovered a box containing cocaine. Defendants argued that the search and seizure was illegal and, accordingly, sought suppression of "all fruits derived illegally from the search and seizure." Codefendants Ayala and Cantuo also filed motions to suppress, and the trial court conducted a hearing on all three motions.

At the hearing, Officer Andrew Carvajal testified that on April 1, 2004, he was a member of the Chicago police department's long-term narcotics investigation team when he met with, and received information from, a paid confidential informant. Officer Carvajal classified the informant as "reliable" and indicated that he had received information from this informant on approximately 30 to 40 occasions over the past two years, and that the informant's information had led to number of arrests as well as the seizure of narcotics. He could only recall three occasions where the informant's tip did not prove to be accurate. On this occasion, the informant told Officer Carvajal that "he had information that a shipment of cocaine had arrived" at a residence located at 4405 South Trumbull "either the night before or *** two nights before." The informant further informed Carvajal that a man named "Carlos" resided at that address and described him as a short Hispanic male with a slim build who was in his late thirties. The informant did not identify defendant or provide any specific information pertaining to him.

2

Moreover, the informant did not provide any information as to how the narcotics were packaged. At the conclusion of the conversation with his confidential informant, Officer Carvajal conducted a meeting and relayed the information provided by the informant to the other members of his team. After hearing the substance of the informant's tip, the team decided to conduct a surveillance operation at 4405 South Trumbull. Accordingly, Officer Carvajal and approximately 10 other officers commenced surveillance at the South Trumbull address at approximately 3:30 p.m.

In explaining his role in the surveillance operation, Officer Carvajal testified that he wore plain clothes and sat alone in an unmarked car parked in an alley near the residence. He had radio contact with the other members of his team. At some point, Officer Robert Bertermann, who was engaged in surveillance in the front of the residence, informed the other officers over the radio that defendant was in the area. Specifically, Officer Bertermann relayed over the radio that defendant and a female approached 4405 South Trumbull in a vehicle, that defendant conversed with a man later identified as codefendant Carlos Ayala, that Ayala then entered the house, retrieved a bag, which he handed to defendant, and that defendant and the woman accompanying him returned to their vehicle and drove away. Officer Carvajal never saw defendant from his surveillance position in the rear of the South Trumbull residence. He explained that defendant was not arrested after receiving the bag because no one had seen defendant commit a crime. Instead, mobile surveillance commenced on defendant's vehicle.

Officer Bertermann confirmed that he assumed a surveillance position at the front of the South Trumbull residence on April 1, 2004, at approximately 3:30 p.m. He further confirmed

3

that at approximately 5:30 p.m, he saw defendant arrive at 4405 South Trumbull in a Jeep vehicle that contained a female occupant, who was later identified as Candelaria Vargas, and converse with Carlos Ayala on the front steps of the residence. From his surveillance position, he was unable to hear the contents of the five-minute conversation. At the conclusion of the conversation, Officer Bertermann observed Ayala enter the residence and emerge shortly thereafter with a large plastic bag containing a square-shaped box that was approximately 15 inches high and 6 inches wide. Although he was unable to see the contents of the box, Officer Betermann saw Ayala hand the box to defendant, who then placed it in the Jeep and proceeded to drive northbound on Trumbull Avenue. Several members of the surveillance team then commenced mobile surveillance on defendant's vehicle.

Officer Fernando Velez was part of the four-person team that engaged in mobile surveillance on defendant's car. Mobile surveillance commenced on South Trumbull Avenue and concluded approximately one hour later at 4000 North on the Kennedy Expressway. Officer Velez explained he witnessed defendant make two lane violations near Diversey Avenue. Specifically, he observed defendant change lanes without using his turn indicator. However, because Officer Velez was driving an unmarked police vehicle that was not equipped with flashing lights or emergency equipment, he was unable to pull over defendant's vehicle. Accordingly, he obtained the assistance of several officers from the 17th District, who curbed defendant's vehicle. At the time of the traffic stop, Officer Velez conceded that he possessed neither a search warrant nor an arrest warrant. Nevertheless, after defendant's vehicle was stopped, Officer Velez walked to defendant's car, identified himself as a police officer, revealed

4

that he was part of a narcotics investigation, and that defendant had been seen accepting a box from the South Trumbull residence that was under surveillance. Defendant immediately acknowledged that he had received a box containing narcotics at the residence. Defendant further stated that Candelaria Vargas, his passenger, was not involved in the transaction. Following defendant's confession, Officer Velez recovered a Mr. Coffee box containing 5,118 grams of shrink-wrapped cocaine, which was sitting in plain view in the backseat of the vehicle. After he recovered the narcotics, Officer Velez placed defendant into custody and used his radio to inform the remaining members of the surveillance team that narcotics had been recovered from defendant's car. Officer Velez acknowledged that defendant did not receive a ticket for the traffic violations and that he did not mention the lane violations in the report that he prepared of defendant's arrest.

Candelaria Vargas confirmed that she was a passenger in defendant's car on April 1, 2004, when police stopped the vehicle at approximately 6:30 p.m. She testified that defendant was a friend of her father's and denied that he was her boyfriend. Vargas acknowledged that she and defendant had visited 4405 South Trumbull earlier in the day and that defendant conversed with Carlos Ayala; however, she did not see Ayala hand defendant a package. After leaving the South Trumbull residence, Vargas explained that defendant "was driving fine." She did not observe defendant make any lane changes without using his turn indicator; rather, "[i]f he did move, he did put the signal on." After police stopped defendant's vehicle, two officers approached the car, and one of the officers immediately removed defendant from the car and "quickly" placed him in handcuffs without engaging in any prior conversation. Vargas then

exited the car herself and was also handcuffed and led away from the vehicle. She then saw an officer remove a bag from the rear of the car. Vargas denied that any conversation had taken place prior to the removal of the bag because "[t]here wasn't any time."

While Officer Velez commenced mobile surveillance on defendant's car, Officers Carvajal and Betermann remained in their surveillance positions near the South Trumbull residence. At approximately the same time that Officer Velez stopped defendant's vehicle after defendant had made two illegal lane changes, Officer Betermann observed codefendant Cantuo arrive at the South Trumbull residence. Officer Betermann saw Ayala hand Cantuo a box that was approximately 10 inches long and 8 inches wide. After observing the second transaction, Officer Betermann believed he had witnessed narcotics transactions and commenced mobile surveillance on Cantuo's vehicle. He then heard Officer Velez's radio transmission that narcotics had been recovered from defendant's vehicle. Thereafter, Officer Betermann confronted Cantuo, who consented to a search of his vehicle. During the search, Officer Betermann recovered a box containing cocaine from the backseat of Cantuo's vehicle. Defendant and Cantuo were then both transported back to 4405 South Trumbull. Thereafter, police entered the South Trumbull residence, arrested codefendant Carlos Ayala, and recovered a suitcase containing cocaine from the trunk of a vehicle parked in Ayala's garage.

Upon the conclusion of the live testimony, the parties delivered closing arguments. Defense counsel initially emphasized that the informant's tip did not mention defendant and did not contain sufficient detail; rather, the informant simply provided an address and the name "Carlos." Accordingly, counsel argued that at the time of the stop, the police did not have

6

reasonable suspicion that defendant was involved in a narcotics transaction based on the informant's tip. Thereafter, counsel conceded that the issue of whether defendant actually committed the alleged traffic violations was essentially a credibility determination based on the conflicting testimony of Officer Velez and Candelaria Vargas. However, counsel argued that even if the police were initially justified in curbing defendant's vehicle after witnessing two lane violations and conducting an investigatory Terry stop, their subsequent actions were not reasonably related to the scope of the stop. Counsel noted that instead of inquiring about the lane violations, Officer Velez immediately began discussing the narcotics investigation with defendant. Counsel emphasized that the police never ticketed defendant for the purported traffic violations and that the violations were not mentioned in the police report. Accordingly, counsel argued that "this was not a Terry type stop. They were not investigating a lane change. They were making a lack of probable cause type of stop in this case," and, accordingly, suppression was warranted.

After reviewing the evidence, the trial court denied defendant's motion to suppress. In delivering its ruling, the trial court found no credibility in Vargas's testimony, noting that she was unable to provide details as to any social itinerary that took place on April 1, 2004, and further found that Vargas's testimony was tainted by bias, which was "predicated on her relationship, whatever that might be, with defendant." In contrast, the trial court found that "the officers' testimony was succinct and accurate and credible." Based on their testimony, the trial court found that the police were justified in stopping defendant's vehicle after witnessing defendant execute illegal lane changes. The court further found it of "no concern" that the

7

officers' "initial interaction did not relate to the [traffic violation] that could be observed," stating:

"I don't believe the Constitution would constrain that officer to address that item first. I have no problem with the officers initially making these inquiries relative to this narcotics investigation, letting [defendant] know he has been watched for a period of time. I consider that good police work. It is likely in my view that we never reached the traffic stop when a Defendant–certainly consistent with what I believe to be common sense–immediately puts himself in a situation where he is admitting then, not now, that the narcotics are his and not Ms. Vargas' out of some sense of nobility ***. The Defendant at that juncture makes the admission, and the traffic stop, the citations, the presence of absence of a Driver's License or insurance, falls a completely distant second in the investigation."

Thereafter, the court classified defendant's admission as "spontaneous" and found that "he made a knowing, intelligent, and voluntary waiver when he agreed to the search of the vehicle sui [sic] sponte after being confronted with the investigation alone."

After the trial court denied his motion to suppress, defendant retained new counsel, and with the assistance of his newly retained counsel, filed a motion seeking to suppress the incriminating statement that he made to police following the traffic stop. He argued suppression was warranted because he was never informed of his Miranda rights and because the statement was made after he was subjected to "psychological and mental coercion."

Thereafter, the trial court conducted a hearing on defendant's newly filed motion to

8

suppress his statement. Before evidence was presented, however, defense counsel informed the court that defendant withdrew his contention that suppression of his statement was warranted due to purported police coercion and specified that the sole issue before the court was whether suppression was warranted because his Miranda rights were violated.

Officer Velez was the first witness called upon to testify and his testimony was consistent with that offered at the prior hearing. Specifically, Officer Velez testified that after commencing mobile surveillance on defendant's car, he witnessed defendant make two improper lane changes. Once defendant was pulled over, he approached defendant, and upon learning that defendant did not speak English, conversed with defendant in Spanish, and informed defendant that he was a police officer engaged in a narcotics surveillance operation and that defendant had been seen removing a box from the South Trumbull location. Defendant immediately acknowledged that he had picked up a box and that there were narcotics in the box, but denied that his passenger was involved in the narcotics transaction. Officer Velez testified that at the time defendant "volunteered [the] statement," defendant had not been placed under arrest and he had not informed defendant of his Miranda rights. Moreover, defendant was not handcuffed prior to giving his statement. Officer Velez acknowledged that there were eight other police officers nearby, but denied that defendant was surrounded at the time he provided his statement. Following defendant's confession, Officer Velez recovered the box from the backseat of the vehicle.

Defendant testified on his own behalf. He explained that after he was pulled over by police, the officers "came close to the car and they surrounded us. They opened the doors. They

9

pulled us out of the car. And they put the handcuffs on us." Thereafter, he and Vargas were placed in separate police cars and he was driven to a parking lot, where the police commenced a search of his vehicle. Defendant confirmed that he had not been informed of his Miranda rights, but indicated that he never conversed with the police. Specifically, he denied that he informed the officers that he was in possession of narcotics or gave them permission to search his vehicle.

After hearing the aforementioned testimony, the trial court denied defendant's motion to suppress his statement. The court initially noted that defendant acknowledged in his written motion that he had made a statement to police and, accordingly, the allegations in the motion were inconsistent with defendant's live testimony. The court indicated that it would accept the allegations in the written motion that a statement had, in fact, been made, and held that suppression was not warranted because the statement "was voluntary to the extent the Defendant was not under arrest at the point it was made and there was no obligation under Miranda to give him any rights at that time."

Following the denial of defendant's pretrial motions, the parties proceeded to trial. At the start of defendant's bench trial, the parties stipulated to the testimony provided at the two prior suppression hearings. Officer Velez was the sole witness to provide live testimony. At trial, he explained that on April 1, 2004, he recovered a cardboard Mr. Coffee box encased in a plastic bag that contained "ten and half kilograms of cocaine, heat sealed." The parties then stipulated that the chain of custody was properly maintained and that 5,118 grams of cocaine were recovered from the box. After reviewing the prior hearing transcripts, the trial court declined to convict defendant of possession of a controlled substance with intent to deliver and, instead,

found him guilty of the lesser-included offense of possession of a controlled substance. The trial court then presided over defendant's sentencing hearing, and after considering the arguments advanced in aggravation and mitigation, sentenced defendant to 10 years' imprisonment, "the minimum [sentence] allowable under the law" based on the amount of cocaine recovered from defendant's vehicle.

Defendant filed a posttrial motion, seeking a reduction of his sentence, which the trial court denied. Thereafter, he filed a timely notice of appeal.

On appeal, defendant solely contests the trial court's denial of his motion to suppress the cocaine seized from his car. He advances no argument contesting the trial court's denial of his pretrial motion to suppress his statement based on purported Miranda violations.

Initially, we must address the State's argument that defendant has forfeited appellate review of this issue because he failed to properly preserve this claim. Specifically, defendant failed to challenge the trial court's ruling on his motion to suppress in a posttrial motion.

As a rule, to properly preserve an issue for appellate review, the defendant must make a timely objection at trial and include the error in a written posttrial motion. People v. Enoch, 122 Ill. 2d 176, 186 (1988); People v. Jones, 364 Ill. App. 3d 740, 748 (2006). However, in this case, we note that defense counsel orally informed the court that he wished to preserve all of defendant's "appellate rights with regard to legal motion that [was] previously filed," and the State made no objection to defense counsel's statement. Moreover, following the trial, defense counsel made an oral motion for a new trial, and again, the State made no objection. See People v. Ramirez, 312 Ill. App. 3d 1, 2 (2000) (declining to view the defendant's argument as waived

11

when the State made no objection to defense counsel's oral motion to preserve the defendant's appellate rights); see also Enoch, 122 Ill. 2d at 188 (recognizing that the State can waive its right to assert forfeiture based on the defendant's failure to raise a trial objection and file a written posttrial motion if the State fails to object to the defendant's oral motion for a new trial). Furthermore, because defendant's claim implicates fundamental constitutional concerns it is subject to plain error review. People v. Bui, No. 1-05-3880 (March 21, 2008); 134 Ill. 2d R. 615(a). For these reasons, we will address the merit of his appeal.

As another preliminary matter, we note that defendant acknowledges in his opening brief that he has failed to provide transcripts of the portion of the joint hearing conducted on December 14, 2004. As a general rule, it is the appellant's burden to provide a sufficiently complete record to allow for meaningful appellate review and all doubts arising from the incompleteness in the record will be resolved against the appellant. Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984); Koppel v. Michael, 374 Ill. App. 3d 998, 1007-08 (2007). In this case, the joint hearing commenced on October 6, 2004, and was conducted over a period of several days. On October 26, 2004, the hearing was continued until December 14, 2004, to allow codefendants' counsel to call one additional witness. Defendant, however, has been unable to procure the transcript from the December 14, 2004, continuance date. At oral argument, defense counsel informed this court that when he contacted the court reporter's office he was told that the case was not on call for that date; however, he has been unable to obtain an affidavit from the court reporter because she has been on medical leave. Counsel further informed this court that he believes the December 14, 2004, hearing date is not relevant to resolve defendant's appeal. We

12

now turn to the merit of defendant's appeal.

In reviewing an appeal from a trial court's ruling on a motion to suppress, we apply the two-part standard of review adopted by the United States Supreme Court in Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). People v. Luedemann, 222 Ill. 2d 530, 542 (2006). Accordingly, the trial court's factual findings are reviewed for clear error and will only be reversed if they are against the manifest weight of the evidence. People v. Sorenson, 196 Ill. 2d 425, 431 (2001); In re Mario T., 376 Ill. App. 3d 468, 472 (2007). However, the trial court's ultimate decision as to whether suppression is warranted is reviewed de novo. Sorenson, 196 Ill. 2d at 431; Mario T., 376 Ill. App. 3d at 472. In this case, defendant does not challenge any of the trial court's factual determinations. Accordingly, the sole issue before this court is his legal challenge to the trial court's ultimate disposition, which we review de novo.

On appeal, defendant contends that the trial court erred in denying his motion to suppress because police violated his fourth amendment right to be free from unreasonable searches and seizures when they stopped defendant's car after he committed several traffic violations and immediately engaged in conversation about their narcotics investigation instead of inquiring into the traffic offenses. Defendant maintains that at the time of the stop, police lacked reasonable suspicion to believe he had committed a narcotics offense, and, accordingly, the police unjustifiably prolonged the traffic stop when they commenced discussion of their narcotics investigation. The State responds that the officers who stopped defendant's car had reasonable suspicion to believe that defendant had committed a narcotics offense based on the tip provided

by Officer Carvajal's confidential informant. Accordingly, the police were justified in engaging defendant in a discussion about their narcotics surveillance operation immediately after they curbed his vehicle.

The fourth amendment of the United States Constitution recognizes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV.[1]  The guarantees of the fourth amendment apply to states through the due process clause of the fourteenth amendment.  People v. James, 163 Ill. 2d 302, 311 (1994).  Reasonableness is the " 'central requirement' " of the fourth amendment.  Illinois v. McArthur, 531 U.S. 326, 330, 148 L. Ed. 2d 838, 847, 121 S. Ct. 946, 949 (2001), quoting Texas v. Brown, 460 U.S. 730, 739, 75 L. Ed. 2d 502, 512, 103 S. Ct. 1535, 1542 (1983); see also People v. Conner, 358 Ill. App. 3d 945, 949 (2005).

Pursuant to the United States Supreme Court's ruling in Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), "an officer may 'briefly stop a person for temporary questioning if the officer has knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed or is about to commit a crime.' " People v. Richardson, 376 Ill. App. 3d 612, 617 (2007), quoting People v. Lee, 214 Ill. 2d 476, 487 (2005).  Reasonable suspicion "is a less exacting standard than probable cause" (People v. Ward, 371 Ill. App. 3d 382, 412 (2007)) and "exists when 'articulable facts which,

---

[1] We note that a similar constitutional guarantee is also reflected in article I, section 6, of the Illinois State Constitution.  Ill. Const. 1970, art. I, §6 ("people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, [and] seizures").  On appeal, however, defendant solely challenges the legality of the search and seizure under federal grounds.

taken together with the rational inferences from those facts, *** warrant a reasonably prudent officer' to investigate" (People v. Lampitok, 207 Ill. 2d 231, 255 (2003), quoting Maryland v. Buie, 494 U.S. 325, 334, 108 L. Ed. 2d 276, 286, 110 S. Ct. 1093, 1098 (1990)).

Under some circumstances, an informant's tip may provide police officers with the reasonable suspicion necessary to effectuate a proper Terry stop. People v. Lee, 214 Ill. 2d 476, 487 (2005); People v. Miller, 355 Ill. App. 3d 898, 901 (2005). The informant's classification as a citizen informant or a paid informant is "unimportant." People v. Munson, 206 Ill. 2d 104, 123 (2002); see also People v. Nitz, 371 Ill. App. 3d 747, 752 (2007) (recognizing that "[c]ourts no longer employ rigid presumptions based on the distinction between citizen informants and paid informants"). Rather, to determine whether an informant's tip provides reasonable suspicion, it is important to consider the informant's reliability as well as the quality and content of the information that he or she provided. Lampitok, 207 Ill. 2d at 257; Miller, 355 Ill. App. 3d at 901. Specifically, courts should consider "the detail of the tip, whether the tip established the informant's basis of knowledge, whether the informant indicated he or she witnessed any criminal activity, and whether the tip accurately predicts future activity of the suspect." People v. Kline, 355 Ill. App. 3d 770, 776 (2005); see also Lampitok, 207 Ill. 2d at 257-58. Indeed, "[a]n informant's ability to predict a person's future behavior is an important indicator of reliability because '[w]hen significant aspects of the [informant's] predictions [are] verified, there [is] reason to believe not only that the [informant] was honest but also that he was well informed, at least well enough to justify the stop.' " People v. Chavez, 327 Ill. App. 3d 18, 32 (2001), quoting Alabama v. White, 496 U.S. 325, 332, 110 L. Ed. 2d 301, 310, 110 S. Ct. 2412, 2417 (1990).

Generally, "where the information lacks sufficient detail and the informant does not claim to have witnessed any criminal activity, the information is not reliable without corroboration and a stop may not be warranted." People v. Jackson, 348 Ill. App. 3d 719, 731 (2004).

Both parties rely on Chavez to support their respective arguments as to the existence, or lack thereof, of reasonable suspicion in this case based on the informant's tip. In Chavez, police commenced a surveillance operation upon the receipt of information from a known confidential informant who had provided police with information on nine prior occasions, eight of which resulted in the seizure of contraband. On this occasion, the informant revealed that "Victor," a 5-foot 10-inch tall " 'Latino male' " weighing 180 pounds, would drive a Ford automobile to a specific tavern to pick up two kilograms of cocaine. From their surveillance position near the tavern, police observed the defendant arrive at the tavern at approximately 7:50 p.m. driving a Ford Taurus. The defendant entered the tavern and exited five minutes later carrying a brick-shaped object, which he placed in the backseat of his car. Police stopped the defendant's car one block from the tavern, and after learning that the defendant's name was Victor Chavez, seized the brick-shaped object, which consisted of wrapped cocaine, from the vehicle. Chavez, 327 Ill. App. 3d at 23-24.

The trial court denied the defendant's motion to suppress, and thereafter, he was convicted of possession of a controlled substance with intent to deliver. On appeal, the defendant sought reversal of his conviction, asserting, in pertinent part, that the informant's tip did not provide police with reasonable suspicion to effectuate a Terry stop. We disagreed. Initially, we noted that the informant had a "formidable track record of reliable information"

16

based on the fact that eight out of his nine prior tips resulted in the seizure of contraband. Chavez, 327 Ill. App. 3d at 32. Thereafter, we noted:

> "Importantly, the officers were also able to confirm the informant's prediction of defendant's future behavior as they were able to observe defendant carry what looked like two kilogram bricks of cocaine out of the tavern. It is critical that the cocaine bricks were visible as defendant crossed the street and were also visible from the outside of defendant's vehicle. Had the bricks been obscured from view, the police would not have had sufficient confirmation of specific and articulable facts that the defendant had committed, or was about to commit, a crime." Chavez, 327 Ill. App. 3d at 32.

Because the informant's tip provided police with the reasonable suspicion necessary to effectuate a Terry stop, we upheld the defendant's conviction. Chavez, 327 Ill. App. 3d at 32, 36.

In this case, Officer Carvajal's informant, like the informant in Chavez, had a "formidable track record of reliable information." Chavez, 327 Ill. App. 3d at 32. Officer Carvajal testified that his informant had provided him with tips on 30 to 40 occasions, and that the tips had resulted in the seizure of contraband on all but three occasions. Despite the informant's impressive track record, however, we do not find his tip provided officers with reasonable suspicion that defendant had committed a narcotics offense. Unlike the tip in Chavez, the informant's tip in this case was devoid of any prediction of future behavior. The informant simply revealed to Officer Carvajal that "he had information that a shipment of cocaine had arrived" at a residence located at 4405 South Trumbull "either the night before or *** two nights before" and that a man named "Carlos," who was a slim Hispanic male in his late thirties, resided

at that address. In addition to the lack of prediction of future behavior, the tip also failed to establish the informant's basis of knowledge. See In re D.W., 341 Ill. App. 3d 517, 523 (2003). Indeed, the informant did not reveal that he had witnessed any criminal act or explain how he garnered his information. Jackson, 348 Ill. App. 3d at 732. We also find that the informant's tip in this case lacks specificity. Ward, 371 Ill. App. 3d at 413 (finding that an informant's tip, alone, did not provide police with reasonable suspicion because it lacked specificity). Notably, the informant did not provide any details of the cocaine shipment, including the amount of cocaine that was shipped, the method of shipment, or the manner in which the cocaine was packaged.

Finally, there is nothing to suggest that police were able to corroborate any of the details that were provided by the confidential informant at the time of the stop. See Kline, 355 Ill. App. 3d at 776-77 (finding that an informant's tip did not provide police with reasonable suspicion because the tip did not contain sufficient details that police were able to corroborate prior to seizing the defendant). Indeed, while the cocaine bricks in Chavez were visible to the officers engaged in surveillance in that case, Officer Betermann testified that he was unable to see the contents of the bag that defendant had received from Ayala. Chavez, 327 Ill. App. 3d at 32. Moreover, Officer Carvajal testified that the first time that police learned that the man who resided at the South Trumbull residence was named Carlos was at the time of Ayala's arrest. Although the State emphasizes that defendant was stopped after police observed two suspicious transactions, the record actually reveals that defendant's car was seized at approximately the same time that codefendant Cantuo arrived at the South Trumbull residence. While Officer

Betermann testified that he heard Officer Velez's radio transmission that narcotics had been recovered from defendant's car within seconds after he commenced mobile surveillance on codefendant Cantuo's vehicle, the record is devoid of evidence that Officer Velez was aware of the second transaction at the time he stopped defendant's vehicle. Indeed, Officer Velez testified that at the time he made his radio transmission informing other members of his team that he had recovered narcotics from defendant's vehicle he did not know what his other team members were doing.

Accordingly, we disagree with the State that the informant's tip in this case provided police with reasonable suspicion to believe that defendant had engaged in a narcotics transaction at the time they stopped his vehicle. We must now determine whether the police, absent reasonable suspicion to believe defendant had committed a narcotics offense, violated defendant's constitutional right to be free from unreasonable searches and seizures when they stopped defendant's car for a traffic violation and immediately initiated conversation regarding the narcotics surveillance operation.

Defendant, relying on People v. Gonzalez, 204 Ill. 2d 220 (2003), contends that although Officer Velez was justified in stopping defendant's vehicle after defendant had changed lanes without signaling, his subsequent conduct in confronting defendant with evidence of the narcotics surveillance operation was impermissible because it "was in no way reasonably related to the lane change violations" and necessarily prolonged the duration of the stop. The State, however, citing our supreme court's recent decision in People v. Harris, No. 103796 (March 20, 2008), responds that it is immaterial that Officer Velez's questioning was not reasonably related

19

to the lane change violation and that there is no evidence his questioning unreasonably increased the duration of the stop.

Initially, we note that the parties agree that defendant was seized when police stopped his vehicle. Berkemer v. McCarty, 468 U.S. 420, 436-37, 82 L. Ed. 2d 317, 332, 104 S. Ct. 3138, 3148 (1984) (" 'stopping an automobile and detaining its occupants constitute a "seizure" ' " under the fourth amendment), quoting Delaware v. Prouse, 440 U.S. 648, 653, 59 L. Ed. 2d 660, 667, 99 S. Ct. 1391, 1396 (1979); see also People v. Bunch, 207 Ill. 2d 7, 13 (2003). The parties also agree that Officer Velez's decision to stop defendant's vehicle was reasonable and, accordingly, the initial seizure lawful, because he had probable cause to believe that defendant had committed a traffic violation. Whren, 517 U.S. at 810, 135 L. Ed. 2d at 95, 116 S. Ct. at 1772; Harris, slip op. at 8; Sorrenson, 196 Ill. 2d at 433. Indeed, Officer Velez testified that he witnessed defendant change lanes without signaling on two occasions, a clear violation of the Illinois Vehicle Code. See 625 ILCS 5/11-804(d) (West 2004). However, because " 'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution' " (Harris, slip op. at 11, quoting Illinois v. Caballes, 543 U.S. 405, 407, 160 L. Ed. 2d 842, 846, 125 S. Ct. 834, 837 (2005)), we must evaluate the reasonableness of Officer Velez's conduct following the initial stop.

Prior to Harris, Illinois courts analyzed the propriety of police conduct during a traffic stop in accordance with the framework set forth in People v. Gonzalez, 204 Ill. 2d 220 (2003). In Gonzalez, the court analogized a typical traffic stop to a Terry investigative stop and held that Terry's "dual inquiry" should be applied to determine the reasonableness of police conduct

20

during the course of the stop. Gonzalez, 204 Ill. 2d at 228. Specifically, reviewing courts were to directed to consider: (1) whether the stop was " 'justified at its inception' " (i.e. whether the officer had probable cause to believe that the defendant committed a traffic violation); and (2) whether the officer's conduct during the course of the stop " 'was reasonably related in scope to the circumstances which justified the [stop] in the first place.' " Gonzalez, 204 Ill. 2d at 228, quoting Terry, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. With respect to the second prong, the court explained that for an officer's conduct to be considered lawful, the officer could neither "impermissibly prolong[] the detention" nor "change[] the fundamental nature of the stop." Gonzalez, 204 Ill. 2d at 235. Applying these principles to the case at hand, the court held that the defendant's fourth amendment rights were not violated when an officer requested the defendant, a passenger in a vehicle subject to a lawful traffic stop, to provide identification because the officer's request did not prolong the defendant's detention or change the nature of the traffic stop. Gonzalez, 204 Ill. 2d at 236.

Thereafter, two subsequent United States Supreme Court cases cast doubt on the viability of the alteration of the fundamental nature of the stop portion of the scope prong established in Gonzalez. In Illinois v. Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), the court addressed the question of "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." The defendant in Caballes was lawfully stopped after he was observed exceeding the speed limit. While one state trooper wrote up a speeding ticket, another officer walked around the defendant's car with a trained narcotics-detection dog. The dog alerted at the trunk,

and based on the dog's alert, the officers searched the defendant's trunk, found marijuana, and arrested the defendant. After the defendant's motion to suppress was denied, he was convicted of a narcotics offense. Caballes, 543 U.S. at 406-07, 160 L. Ed. 2d at 845-46, 125 S. Ct. at 836-37. In rejecting the argument that the officer's use of a narcotics-detection dog infringed on the defendant's constitutional rights, the Court explained that the initial stop was lawful because it was based on probable cause that the defendant had committed a traffic violation. Caballes, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. The Court then recognized that a lawful seizure may become unlawful if police conduct following the initial seizure unreasonably prolonged the stop, but accepted the state court's conclusion that the dog sniff did not impermissibly extend the duration of the stop because it was conducted while the officer wrote up the traffic warning. Caballes, 543 U.S. at 407-08, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. Thereafter, the Court rejected the argument that the dog sniff fundamentally changed the character of the traffic stop, explaining that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. [Citation.] We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'comprises no legitimate privacy interest.' [Citation.]" (Emphasis omitted.) Caballes, 543 U.S. at 408, 160 L. Ed. 2d at 847, 125 S. Ct. at 837. Accordingly, because the use of the narcotics dog did not prolong the stop and did not infringe on the defendant's legitimate interest in privacy, the Court concluded that the defendant's rights under the fourth amendment were not violated. Caballes, 543 U.S. at 410, 160 L. Ed. 2d at 848, 125 S. Ct. at 838.

Approximately two months later, the Supreme Court again addressed the propriety of police conduct during a lawful seizure in Muehler v. Mena, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005). In Muehler, Iris Mena was detained in handcuffs by police who were executing a search warrant of the premises in which she and several others resided to search for a suspect in a recent gang-related shooting. While she was detained during the search of the residence, an officer asked Mena to provide her name, date and place of birth, as well as her immigration status. Following her detention, Mena filed a section 1983 (42 U.S.C. §1983 (2000)) lawsuit against the officers, claiming the officers detained her " 'for an unreasonable time and in an unreasonable manner,' " thus violating her rights under the fourth amendment. Muehler, 544 U.S. at 96, 161 L. Ed. 2d at 306, 125 S. Ct. at 1469. The Supreme Court rejected the contention that the officers' questioning Mena about her immigration status constituted a fourth amendment violation. Finding that Mena was lawfully seized during the officers' execution of the search warrant, the Court concluded that the officers' questioning of Mena did not constitute an additional fourth amendment violation, explaining, "[w]e have 'held repeatedly that mere police questioning does not constitute a seizure.' [Citations.] '[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage.' [Citation.]" Muehler, 544 U.S. at 101, 161 L. Ed. 2d at 308, 125 S. Ct. at 1471. Accordingly, like the dog sniff in Caballes, because there was no evidence the questioning prolonged Mena's detention, "no additional Fourth Amendment justification [i.e., reasonable suspicion] for inquiring about Mena's immigration status was required." Muehler, 544 U.S. at

23

101, 161 L. Ed. 2d at 309, 125 S. Ct. at 1472. Thus, no fourth amendment violation occurred. Muehler, 544 U.S. at 102, 161 L. Ed. 2d at 309, 125 S. Ct. at 1472.

Our supreme court was called upon to interpret and apply the Caballes and Muehler holdings in People v. Harris, No. 103796 (March 20, 2008).[2] The defendant in Harris was a passenger in car that was stopped by police after the driver had made an illegal left turn. After the vehicle was stopped, the officer requested the defendant and the driver of the vehicle to provide identification. The officer returned to his squad car, searched the information provided by the defendant and the driver and discovered that there was an outstanding arrest warrant for the defendant. The officer conceded that he had not had reasonable suspicion to believe that there was a warrant for the defendant's arrest at the time of the search. However, based on the results of the search, the officer arrested the defendant and discovered cocaine in the defendant's jacket pocket during the search incident to the arrest. Thereafter, the defendant was charged and convicted of unlawful possession of a controlled substance. Harris, slip op. at 1-3.

In determining whether the defendant's fourth amendment rights were violated, our supreme court initially concluded that the defendant was lawfully seized because the arresting officer had probable cause to stop the vehicle after observing the driver make an illegal left turn. Harris, slip op. at 8. Thereafter, the court reasoned that based on the decisions in Caballes and

---

[2] This is the second time our supreme court has filed an opinion in this case. The court initially considered this case in 2003, when it filed an opinion affirming the judgment of the appellate court (People v. Harris, 325 Ill. App. 3d 262 (2001)) reversing the defendant's conviction. People v. Harris, 207 Ill. 2d 515 (2003). However, the United States Supreme Court vacated the court's judgment and remanded for reconsideration in light of the Caballes decision. Illinois v. Harris, 543 U.S. 1135, 161 L. Ed. 2d 94, 125 S. Ct. 1292 (2005).

1-05-2791

Muehler, the United States Supreme Court had

>"rejected [the] reasoning that led to this court's adoption of the 'fundamental alteration of the nature of the stop' portion of the 'scope' prong of Gonzalez. All that remains is the duration prong. During a lawful seizure, as occurred in both Muehler and Caballes, the police may ask questions unrelated to the original detention and are not required to form an independent reasonable suspicion of criminal activity before doing so." Harris, slip op. at 16-17.

Ultimately, the court concluded that the warrant search, like the dog sniff in Caballes, did not unnecessarily prolong the stop and did not implicate any constitutionally protected privacy interests because "a warrant is a matter of public record." Harris, slip op. at 12. Thereafter, the court, relying on Muehler, further found that the officer's initial request for identification was permissible, concluding: "The same principles that permit the questioning of Mena regarding her immigration status without the requirement of individualized reasonable suspicion permit an officer to request the passenger in a stopped vehicle to provide identification." Harris, slip op. at 17-18. Accordingly, the court concluded that neither the officer's request for identification nor the warrant search violated the defendant's rights under the fourth amendment and affirmed his conviction. Harris, slip op. at 22.

Applying the reasoning of Caballes, Muehler, and Harris to the facts at hand, we conclude that no fourth amendment violation occurred. Because defendant was lawfully seized, Officer Velez was not required to have reasonable suspicion to commence a conversation with defendant about the narcotics surveillance operation. Harris, slip op. at 16-17 ("During a lawful seizure,

25

*** police may ask questions unrelated to the original detention and are not required to form an independent reasonable suspicion of criminal activity before doing so"). Moreover, because "the possession of contraband 'compromises no legitimate privacy interest' " (Caballes, 543 U.S. at 408, 160 L. Ed. at 847, 125 S. Ct. at 837, quoting United States v. Jacobsen, 466 U.S. 109, 123, 80 L. Ed. 2d 85, 100, 104 S. Ct. 1652, 1661 (1984)), the conversation did not infringe on defendant's constitutionally protected interest in privacy. Accordingly, as long as Officer Velez's actions did not unreasonably prolong the duration of the stop, no fourth amendment violation occurred. Although defendant adamantly contends that the conversation necessarily prolonged the duration of the stop, he cites to no evidence to substantiate his claim. The record reveals once defendant was stopped, Officer Velez immediately informed defendant of the surveillance operation and revealed that defendant had been seen accepting a box from the South Trumbull residence. Defendant, in turn, immediately acknowledged that he had received a box from the residence, admitted the box contained narcotics, and informed Officer Velez that his passenger was unaware of the narcotics transaction. Indeed, at oral argument, defense counsel conceded that the conversation was "brief."

Accordingly, the facts in this case are readily distinguishable from those present People v. Bunch, 207 Ill. 2d 7 (2003), and People v. Parra, 352 Ill. App. 3d 584 (2004), the primary cases defendant relies upon to support his contention that the police in this case prolonged the stop, because the records in Bunch and Parra revealed that the officers engaged in conversations unrelated to the purpose of the traffic stops with the defendants after they had concluded their investigations of the traffic stops. See Bunch, 207 Ill. 2d at 19 (finding that the defendant's

fourth amendment rights were violated when "the purpose of the traffic stop concluded" but "[t]he officer's directions to defendant *** continued"); Parra, 352 Ill. App. 3d at 589 (explaining that "[b]ecause [the officer's] questions occurred after the purpose of the stop was completed, the questions impermissibly prolonged defendant's detention"). Here, in contrast, the purpose of the stop had not concluded when Officer Velez commenced his conversation with defendant about the narcotics surveillance operation. Based on the facts in this case, we find the conversation initiated by Officer Velez, although unrelated to the traffic stop, did not infringe on defendant's fourth amendment rights. Accordingly, we find that the trial court correctly found that defendant's motion to suppress lacked merit.

Notwithstanding the lack of merit of defendant's motion to suppress, defendant contends that he is entitled to a new suppression hearing because the trial court improperly relied upon evidence outside of the record in denying his motion, thus violating his constitutional right to a fair and impartial trial. Specifically, defendant contends that the trial court relied on facts outside the record when finding that the testimony offered by Candaleria Vargas at the suppression hearing was not credible.

The State again contends that defendant failed to properly preserve this argument, asserting that defendant's failure to object to trial judge's statements at trial and in a post-trial motion resulted in forfeiture of this argument. Enoch, 122 Ill. 2d at 186. Defendant acknowledges that he failed to properly preserve this claim but correctly notes that claims of error involving judicial misconduct are not generally subject to the same rules of waiver. See People v. Dameron, 196 Ill. 2d 156, 171 (2001); People v. Jennings, 364 Ill. App. 3d 473, 483

27

(2005). Accordingly, defendant's argument concerning the trial court's conduct is subject to plain error review. People v. Hamilton, 361 Ill. App. 3d 836, 847 (2005); Jennings, 364 Ill. App. 3d at 483. However, even if we determine an error occurred, the error will be deemed harmless "where we can safely conclude that the proceedings below would have produced the same result had the error not occurred." Hamilton, 361 Ill. App. 3d at 847; Jennings, 364 Ill. App. 3d at 483. We now address the merit of defendant's argument.

The federal and Illinois state constitutions afford criminal defendants due process of law, and, accordingly, every defendant is guaranteed the right to a fair and impartial trial. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, §8. In a bench trial, the trial judge is presumed to know and properly apply the law (People v. Robinson, 368 Ill. App. 3d 963, 976 (2006)) and it is permissible for the trial judge to comment on the credibility of witnesses (People v. Hawkins, 243 Ill. App. 3d 210, 220 (1993)). However, a defendant's due process rights are violated when the trial judge's findings are based on evidence outside the record. See People v. Hamilton, 361 Ill. App. 3d 836, 849 (2005) ("In a bench trial, a judge's determination based on his own private knowledge, that is untested by cross-examination or the rules of evidence, amounts to a denial of due process").

Defendant initially contends that the trial court relied on facts not in evidence when it deemed Candelaria Vargas's testimony incredible due to her romantic relationship with defendant. Defendant bases his contention on the remarks made by the trial court in delivering its ruling. Specifically, defendant points to the following statement:

"[T]his is a woman 20 years junior to the Defendant. She accompanies him, according to

28

her, didn't really know where they were going, didn't have any social itinerary other than to the Trumbull Street address and then to the Milwaukee Street address. I don't find any credibility in her testimony. That belief and my view of her credibility is based upon circumstances in which she was, on the facts introduced by the Police Department, and in the manner in which and what I would view as bias predicated on her relationship, whatever that may be, with [defendant]."

Defendant asserts that "[t]he implication of the court's statement–that [defendant] and Vargas were in a romantic relationship–is rebutted by the record," because Vargas denied that defendant was her boyfriend. Accordingly, defendant contends that the trial court impermissibly relied on facts not in evidence when it found Vargas's testimony to be incredible due to her romantic relationship with defendant.

We disagree that the trial court improperly characterized the relationship between Vargas and defendant as a romantic one. Rather, the court found that Vargas's bias was "predicated on her relationship, *whatever that may be*, with [defendant]." (Emphasis added.) Contrary to defendant's argument, the trial court did not characterize the relationship; it merely acknowledged the existence of their relationship and indicated some uncertainty as to the precise nature of that relationship. Because "feelings of bias and the relationship of [a] witness to a defendant are of material relevance" (People v. Gvojic, 160 Ill. App. 3d 1065, 1070 (1987)), and the trial court may comment on witness credibility (Hawkins, 243 Ill. App. 3d at 220), we do not find that the trial court erred in finding Vargas's testimony less credible than that offered by the police officers due to her relationship with defendant.

1-05-2791

Defendant also notes that the court found that Vargas's testimony lacked credibility based on the fact that she "didn't have any social itinerary other than to the Trumbull Street address and then to the Milwaukee Street address" even though there was no testimony offered by any party regarding a Milwaukee Street address.

Defendant is correct that the record is devoid of any reference to a Milwaukee Street address. At the suppression hearing, Vargas testified that on April 1, 2004, she resided in Rockford, Illinois, and she accompanied defendant to the South Trumbull address. Accordingly, to the extent that the trial court mentioned a Milwaukee Street destination, this was an error. However, we deem this error harmless. The court correctly noted that Vargas failed to provide details concerning her travel plans with defendant other than acknowledging a brief visit to the South Trumbull address. Moreover, the court's finding that Vargas's testimony was less credible than that offered by the police officers was not based solely the details or lack thereof provided by Vargas; rather, the court's decision was based in large part on her relationship with defendant.

Finally, defendant contends that the court relied on facts outside the record in denying his motion to suppress when it found that defendant orally consented to a search of his vehicle. Defendant is again correct that there is no evidence in the record that defendant consented to a search of his vehicle. Accordingly, the court's reliance on defendant's consent to uphold the search was error. However, we find that this error, too, was harmless, because we conclude the result would have remained the same absent this error. Notably, while defendant challenged the constitutionality of the stop itself, he never challenged Officer Velez's recovery of the cocaine following his confession. Indeed, notwithstanding defendant's lack of consent to search the

30

vehicle, Officer Velez's recovery of the box was lawful. After defendant confessed to receiving a box containing cocaine from the South Trumbull residence, Officer Velez had probable cause to arrest defendant and was justified in seizing the box, which was sitting in plain view, in the backseat of defendant's vehicle. See generally People v. Jones, 215 Ill. 2d 261, 272 (2005), quoting Texas v. Brown, 460 U.S. 730, 741-42, 75 L. Ed. 2d 502, 513, 103 S. Ct. 1535, 1543 (1983), quoting Payton v. New York, 445 U.S. 573, 587, 63 L. Ed. 2d 639, 651, 100 S. Ct. 1371, 1380 (1980) (during a traffic stop, police may seize an object that is in plain view " ' "assuming there is probable cause to associate the property with criminal activity" ' " (Emphasis omitted)).

Accordingly, we affirm the judgment of the trial court.

Affirmed.

THEIS, J., concurs.

JUSTICE CUNNINGHAM, dissenting:

I respectfully dissent and would reverse the defendant's convictions.

We are presented with prosecution testimony which "taxes the gullibility of the credulous" and therefore cannot support a criminal conviction. People v. Wright, 147 Ill. App. 3d 302, 318, 497 N.E.2d 1201, 1271 (1986). The trial court should have granted the defendant's motions to quash his arrest, excluded the evidence seized, and suppressed the defendant's alleged statements. It is axiomatic that upon review of a criminal conviction, great deference is afforded to the credibility findings of the trier of fact. We must affirm a conviction challenged as based on insufficient evidence or incredible testimony if any rational trier of fact, looking at that

testimony and evidence, could have found that the essential element of the crime were proven beyond a reasonable doubt. People v. Smith, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999). However, a reviewing court also has the solemn duty to reverse a conviction where the evidence is insufficient to prove the defendant guilty beyond a reasonable doubt. Smith, 185 Ill. 2d at 541, 708 N.E.2d at 369. Where, as in this case, the State's main witness has been impeached as to a critical element of his testimony, coupled with his incredible testimony regarding how the drugs came to be discovered in the defendant's car, the issue of reasonable doubt is raised. "While due weight must be given to the trier of fact as to the credibility of [ ] witnesses, 'it is our duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt ***.' " People v. Morgan, 69 Ill. 2d 200, 207-208, 370 N.E.2d 1063, 1066 (1977), quoting People v. Nunes, 30 Ill. 2d 143, 146, 195 N.E.2d 706, 707 (1964).

In the case at hand, unlike the majority, I do not believe that we can or should say that the evidence presented by the State was sufficient to remove all reasonable doubt as to the propriety of the police conduct and therefore the defendant's guilt. People v. Mathis, 133 Ill. App. 3d 1027, 1039-40, 479 N.E.2d 966, 978 (1985). The police officer who stopped the defendant's car claimed that he did so for lane change violations. But by his own admission he never mentioned these violations to the defendant. Instead, he told the defendant he was the subject of a drug investigation. The police officer claimed that immediately upon hearing this statement, the defendant abandoned all caution and common sense and admitted that he had just received a box of drugs and pointed to a box on his backseat. Because I find the testimony of the arresting police officer in this case to be fantastic and incredible, I would find no basis for the stop of the

32

defendant. This in turn would require suppression of his statement to the police and the evidence recovered from his vehicle, necessitating reversal of his conviction. I therefore would not reach the issue of whether the police stop was unlawfully extended.

The State asserts that the police officers who stopped the defendant's car had a reasonable suspicion that the defendant was transporting illegal drugs which he had just obtained from a home where according to a reliable informant, a shipment of cocaine had been received one or two days earlier. I concur with the majority's determination that the police had insufficient cause for a stop on this basis. The arresting police officer knew that another police officer had seen the defendant stop at the home on South Trumbull Avenue and receive from an occupant of the home, a plastic bag which appeared to contain a square box. The defendant then drove away in his car. The arresting police officer acknowledged that his police report erroneously stated that the defendant was seen carrying a Mr. Coffee box from the house on South Trumbull. Despite what the State asserts was ample cause to stop the defendant's car, the police officers, who were several blocks away from the residence when they saw the defendant's car, chose to follow him rather than immediately stop him. They followed him for one hour, in rush hour traffic, ultimately using seven police vehicles.

When they did stop the defendant one hour later, on the Kennedy Expressway, it was allegedly because twelve blocks earlier a police officer had observed the defendant making two lane changes without using his turn indicator. If true, this would have supported a stop of the vehicle for a traffic violation. But the arresting police officer's report of the incident did not mention any lane change violations. The arresting police officer admitted that when he walked

up to the defendant's car after it was stopped, he made no mention to the defendant of *any* traffic violation whatsoever, nor did he ask the defendant for his driver's license, insurance card, vehicle registration, or any other identification customarily requested during a traffic stop. Instead, he immediately told the defendant that, as part of a narcotics investigation, the defendant had been seen accepting a "box" from a residence. The police officer asserted this even though he had previously admitted that he was told only that the defendant had received a "bag" which appeared to contain a box. The defendant then allegedly spontaneously volunteered that he was transporting drugs which he had received from a man named Carlos at the house on South Trumbull. He also allegedly told the arresting police officer that his passenger was not involved in that drug transaction. Based upon this stunning, spontaneous admission, the police seized a Mr. Coffee box from the back seat of the defendant's car, found it to contain 5,118 grams of apparent cocaine in 10 bags, and arrested the defendant and also took his companion into custody. No citation was ever issued to the defendant for the two traffic violations for which the police officers testified they had stopped him in the first place. In fact the only mention of any traffic violation came much later, first appearing at the hearing on the defendant's motion to suppress.

The testimony of the defendant and his companion at the hearing on the motion to suppress the defendant's statements differed significantly from that of the police. The defendant and his companion testified that he was stopped by the police without having committed any traffic violations. The companion testified that she did not observe the defendant changing lanes without using his signal. When a police stopped the defendant, two police officers immediately

approached the car and one of them took the defendant out of his car and handcuffed him without saying a word to him. The defendant had not spoken to them at that point. The defendant's companion also got out of the car and was handcuffed. Without *any* conversation with the defendant, the police searched the car and removed a bag from it. If true, this version of the events would necessitate suppression.

The majority defers entirely to the trial court's credibility determinations. As I have noted, although great deference is to be afforded to such findings, we as a reviewing court are not to act as a rubber stamp, agreeing in all instances with the findings of the trial court no matter how patently improbable the testimony. The facts presented by this case give new meaning to testimony that "taxes the gullibility of the credulous" as described in Wright. It is significant that the trial judge could have convicted the defendant of the charged offense of possession of cocaine with intent to deliver. He was found to be in possession of 5,118 grams of a substance of which 995.3 grams were tested and found to be cocaine. But the trial judge convicted him only of the lesser included offense of possession of a controlled substance and sentenced him to the minimum prison term permitted by law. Even considering that the defendant had no prior convictions, these are not indications of a strong belief in the State's case. Again, we as a reviewing court have a duty to examine the totality of the facts and circumstances presented as evidence and to reverse a conviction if the evidence is insufficient to remove all reasonable doubt of the defendant's guilt.

I find that the testimony of the arresting police officer was grossly improbable and incredible as to the basis for the stop, the subsequent events, and the defendant's spontaneous

confession immediately upon being stopped.  Because the entirety of the State's case was based upon that evidence, the defendant's conviction should be reversed.